4 Pa. Commonwealth Ct. 642 (1972)
Zebra, et al.
v.
School District of the City of Pittsburgh.
Appeal, No. 937 C.D. 1971.
Commonwealth Court of Pennsylvania.
Argued January 6, 1972.
March 1, 1972.
*644 Argued January 6, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.
*645 Justin M. Johnson, Solicitor, with him Bernard Markovitz, Assistant Solicitor, and Thomas J. Cox, Jr., Assistant Solicitor, for appellant.
Paul G. Kachulis, with him John V. Adams, Jr., and Kachulis, Copetas, Adams & Hillen, for appellees.
OPINION BY JUDGE MENCER, March 1, 1972:
On June 15, 1971, the Board of Public Education of the School District of Pittsburgh adopted a School Reorganization Plan affecting numerous public schools within the school district. Under the plan, which was to be effective at the beginning of the 1971-1972 school year, all seventh grade students promoted from Concord Elementary School in June of 1971 were to attend Knoxville Junior High School (Knoxville) in September, 1971, instead of Overbrook Elementary School. Under the reorganization plan, the total enrollment at Knoxville was 835, of which number approximately one-third consisted of white students.
School opened on September 7, 1971, and the seventh grade students who had previously attended the Concord Elementary School were enrolled and in attendance at Knoxville. Soon thereafter incidents occurred of extortion, threats, physical assaults, intimidation and harassment, involving the students coming from Concord Elementary School. On September 23, 1971, a power failure occurred in the area of the city in which the Knoxville school is located and there were rumors that there might be a riot. The next day, a Friday, there was a false fire alarm. The parents of the Knoxville seventh grade students residing within the Concord subdistrict withdrew their children from the Knoxville school on September 24, 1971. The following Monday, *646 September 27, 1971, the parents gathered at the Overbrook Elementary School and demanded that their children be enrolled in the seventh grade of that school.
On September 28, 1971, and on subsequent days of that week, there were discussions held between representatives of the parents and school officials in an endeavor to understand what had happened at Knoxville during the first three weeks of the school year and to decide where the students from the Concord subdistrict were to be assigned in the future. These discussions culminated with a public meeting held on October 2, 1971, when nine school directors, along with the Acting Superintendent and other staff members, listened to complaints and heard of specific incidents involving the students who had been withdrawn from Knoxville by their parents. More than 350 parents and members of the Concord community were in attendance at this public meeting.
On October 8, 1971, the school directors met, discussed the situation at Knoxville and authorized the Acting Superintendent to take whatever steps were necessary to insure the safety and welfare of all the children attending Knoxville. On October 13, 1971, the principal of Knoxville sent a letter to each of the families whose children had been withdrawn from the school. The letter requested the parents' cooperation in returning their children to Knoxville on the first school day following receipt of the letter. The same day a complaint was filed, with 47 parents or guardians of children residing within the Concord Elementary School subdistrict as plaintiffs and the School District of the City of Pittsburgh as defendant.
A hearing was held on October 19, 1971 and October 20, 1971 upon the prayer in the complaint for a preliminary injunction. On October 26, 1971, the Court of Common Pleas of Allegheny County filed an order enjoining *647 the defendant from requiring the children of the 47 plaintiffs to attend Knoxville and directing that defendant provide other school facilities for these children. On October 28, 1971, preliminary objections to the complaint were filed by defendant, to which plaintiffs filed an answer and objections on November 29, 1971. This appeal from the lower court's order of October 26, 1971 was timely brought and is in accordance with the Act of February 14, 1866, P.L. 28, § 1, 12 P.S. § 1101. This Court now has jurisdiction under the Act of July 31, 1970, P.L. 673, No. 223, Art. IV, § 402(4), 17 P.S. § 211.402(4). See Pittsburgh Fire Fighters v. Pittsburgh, 444 Pa. 616, 281 A. 2d 637 (1971).
Our consideration of this appeal must be with the realization that a preliminary injunction is a temporary matter. A final hearing is yet to be held where the lower court will have time to carefully consider the case and reach a final determination. The scope of appellate review in this type of proceeding is well settled. It is expressed succinctly by the Supreme Court in Keystone Guild, Inc. v. Pappas, 399 Pa. 46, 48, 159 A. 2d 681, 683 (1960), in these words: "`Our uniform rule is that, on an appeal from a decree which refuses, grants or continues a preliminary injunction, we will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable.'"
This standard of review was reaffirmed in the recent case of McMullan v. Wohlegemuth, 444 Pa. 563, 570, 281 A. 2d 836, 840 (1971), where it was stated that "[i]t has long been the law of this Commonwealth that appellate courts will not inquire into the merits of disputes on appeal from the grant or refusal of a preliminary *648 injunction, and that we will look no further than a determination of whether reasonable grounds appear for the granting of the preliminary injunction."
An injunction will only issue when the rights of the plaintiff are clear, there is an urgent necessity to avoid injury which cannot be compensated for by damages, and greater injury will be done by refusing it than by granting it. Berman v. Philadelphia, 425 Pa. 13, 228 A. 2d 189 (1967).
We further recognize that the preliminary injunction granted here is in part mandatory in that it requires the defendant to provide other school facilities for the children whose parents and guardians are the plaintiffs here. The rule is that mandatory preliminary injunctions should be granted even more sparingly than those that are merely prohibitory. A mandatory preliminary injunction should only be granted where exceptional circumstances compel the granting to prevent irreparable injury and where the rights of the parties are entirely clear.
Under the instant facts we conclude that the plaintiffs' right appeared clear at the preliminary hearing and that the injury to the children was imminent and, if allowed to be committed further, would be irreparable. An examination of the record discloses that the conditions existing at Knoxville were a serious threat to the health and safety of all the plaintiffs' children. We believe that the lower court fairly described the existing conditions in these words: "There were repeated attempts by the other students to extort money from them. They were repeatedly threatened that if any reports were made to the school authorities, physical retaliation would be made. There was a general lack of discipline in the classrooms and a great deal of confusion and noise existed during classes, making it impossible for conscientious students to concentrate or to *649 make full use of the learning processes. Food was thrown about in the cafeteria, striking other students. Many of the former Concord students became ill, developed nervous conditions, required medical treatment, were afraid while attending Knoxville and remain afraid to return. None of these emotional problems antedated the enrollment of these students at Knoxville."
The record also discloses, without refutation by the school officials, that the following specific incidents occurred at Knoxville between the period of September 7, 1971 and September 24, 1971, which were indicative of the situation that confronted the plaintiffs' children. During a class session, a twelve-year-old boy was stabbed in the back with scissors. A twelve-year-old girl was physically attacked in the girls' lavatory by another student who demanded her choker-type necklace. Her purse was grabbed on another occasion and during classes another student repeatedly knocked her books to the floor. A twelve-year-old boy was knocked into a jigsaw during an instruction period, resulting in a head wound. On another occasion he was slapped by another student, causing him to fall down the stairs, and a book was taken from him and a page ripped out. In a science class, a girl student threw a padlock at him, narrowly missing him and other students. While another twelve-year-old girl was in her English class, a boy pulled her hair, put gum in her hair, spat upon and kicked her. In the cafeteria line, she was threatened with a beating and, in the girls' lavatory, eight girls who were engaged in smoking opened her stall door while she was using the toilet facilities and, against her wishes, attempted to force her to use a sanitary napkin and only ceased their demands on her after she submitted to their insistence to observe for themselves that she was not menustrating.
An eleven-year-old girl was hit and knocked down, requiring that she be taken to the school nurse. The *650 next day she was threatened for reporting the incident and she was thereafter a victim of extortion attempts and had a necklace and books stolen from her. Another student was accosted between classes by two girls who pushed her against a locker, causing her to fall, with other students encouraging one assailant to kill her. One girl was shoved, kicked and her hair was pulled, following numerous attempts to extort money from her. When she reported these incidents to school personnel, another student threatened to kill her if any of her girlfriends were suspended. A fourteen-year-old boy was repeatedly threatened, had his money taken, was tripped and ganged up on by other students.
An eleven-year-old boy, while waiting in the hall for the school bus, had a cup of human urine thrown upon him by another student. He observed children being beaten in the halls, thrown down steps and having money taken from them, all of which took place in front of teachers who did nothing to stop or prevent such happenings. On another occasion his tennis shoes were forcibly removed from his feet by another student who used them himself in a gym class.
Many of the children testified that they were too frightened to report incidents to school officials and that they were threatened with bodily harm if they did so. The record indicates clearly that threats of beatings were commonplace if plaintiffs' children failed to give money to their tormentors or had the courage to report specific incidents to their teachers. Although it is true that school personnel were unaware of many specific incidents, the record does suggest the lack of specific, definitive action on the part of the school authorities to solve the problem even after the plaintiffs took the drastic action they did in removing their children from the school. Although the record discloses the inevitable meetings between school authorities and parents and at *651 various staff levels, little if anything was accomplished or apparently even attempted to deal directly with the problem. Complaints by the school authorities that parents and pupils were uncooperative in specifying incidents and naming names is no excuse whatsoever for the failure of the school authorities to come to grips with the problem. Responsibility for discipline is in the school authorities; it cannot be shifted to the parents of school children or to the children themselves. The noise and confusion permitted in many classrooms indicate a general lack of discipline at Knoxville.
We believe that the testimony of the clinical psychologist offered by the plaintiffs was significant. He testified that the anxiety and fear which existed in plaintiffs' children as a result of the physical violence, the threats, the intimidation, harassment and lack of discipline prevailing at Knoxville interfered with their learning processes and was not a proper educational environment.
We conclude that the lower court had reasonable grounds for granting the injunction. We hold to the view that irreparable harm would result to these boys and girls of tender age if they were subjected further to the conditions described in the testimony. Here we have far more than harmless childish pranks or adolescent informers. The incidents in the instant case are far more serious than the usual bickerings and pranks of twelve-year-olds. Fear can be very damaging at any age but particularly so at eleven and twelve years and it certainly is not very conducive to study and learning.
The lower court, in its opinion, stated that "until such time as this Court is satisfied that the physical and mental well-being of the children of the plaintiffs are fully protected or until final adjudication of this matter, whichever is earlier, we had no alternative but to grant the prayer of the petitioners restraining the *652 defendant from compelling plaintiffs' children to attend Knoxville." We reiterate that we believe the lower court had reasonable grounds under the exceptional circumstances here to so do.
We do not decide the merits of this controversy and express no views on what should be the lower court's final determination in the matter. However, we view this case as one dealing solely with the question of the health, safety and welfare of plaintiffs' children as affected by the conditions existing at Knoxville and as controlled by the applicable rules governing courts in granting mandatory preliminary injunctions. We do not view this case as one dealing with the more common school problems of busing, racial integration of the public schools, or the power and responsibility of the defendant school district to assign students within its jurisdiction and to operate and administer the schools within their statutory powers. The plaintiffs' children will be bussed wherever they attend school and they have never objected to attending Knoxville on any racial basis. The lower court's order did not divest the defendant of its rights in these areas and explicitly left to defendant to determine what school facility plaintiffs' children should attend during the time interval of the preliminary injunction.
The order of the Court of Common Pleas of Allegheny County granting a preliminary injunction in the instant case is affirmed.
DISSENTING OPINION BY JUDGE ROGERS:
I dissent because I am unable to agree with my brothers in the majority that the order entered by the chancellor was a proper exercise of discretion or conformable to law. This is not to say that the action of the parents of any child subjected to assaults, threats and indignities, in withdrawing his child from Knoxville *653 Junior High School was not proper. It was. However, these parents were not confronted with the enforced attendance of their children at Knoxville when they brought this action or when this preliminary injunction was issued. It is true that the Board of Education had not acceded to the plaintiffs' demand that their children be placed at the school of their choice. It is also true that by a letter bearing the same date as the day this suit was instituted the Board requested of these parents their cooperation in improving the educational programs and the safety and security at Knoxville and asked that they "cooperate in returning your child to Knoxville Junior High School." However, there was neither a demand that they then comply with the compulsory attendance laws nor a threat of enforcement of the truancy statutes. Further, counsel for the Board stipulated in open court that no action would be taken to enforce attendance of the students during the chancellor's consideration of the application for preliminary injunction, thus justifying an inference that a similar arrangement might have been made pending a prompt hearing on the merits. For these reasons, the chancellor's order preliminarily enjoining the Board from requiring the plaintiffs' children to attend Knoxville Junior High School was not required to maintain the status quo and was therefore improvident.
Whatever the merits of the restraining order, the mandatory direction that the plaintiffs' children be placed in "Overbrook Junior High School or such other similar and conveniently located school facility" was, I believe, unwarranted; not only as an abuse of discretion but indeed as being contrary to law.
The plaintiffs' children had completed sixth grade at Concord Elementary School. Children from this school had in the past attended seventh grade at Overbrook Junior High School, at which it can be fairly *654 inferred from the record white pupils are preponderant in numbers. For the purpose of improving the racial balance at Knoxville Junior High School and in pursuance of a School Reorganization Plan adopted by the Board of Public Education, the Concord children were assigned to the Knoxville Junior High School. Under the Plan, the total enrollment at Knoxville was expected to be 835, of which thirty to thirty-five percentum were to be white students. The plaintiffs' fifty-eight children were withdrawn by their parents after attending school not more than fourteen days. At the hearing below eleven of these children testified to the incidents painstakingly recounted in the majority opinion, which, as I have noted, justified their withdrawal. Whether the remaining forty-seven children included in the court's order were subjected to similar abuses does not appear in this record. Nor does it appear that the offending conduct was directed against the eleven witnesses because they came from the Concord school. What does appear, however, are repeated efforts on the part of the school principal, other professional employees of the Board of Education and the Board itself, in meetings with the plaintiffs, to ascertain what action the Board might take to satisfy these parents that their children should be returned to school. The uncontradicted evidence is that the plaintiffs were unreceptive to the suggestion that Knoxville might be made a suitable school for their children. No doubt the Board could and should have taken more vigorous measures to improve the general conditions complained of than its action of increasing the staff at the school, including the engagement of an additional security officer; but neither the plaintiffs, the chancellor nor the majority here suggests what those might be. And while it is true that neither the parents nor their children were responsible for promoting discipline and good order, neither is the Board *655 blameworthy for failing to punish or correct misconduct, the nature and perpetrators of which although known to the plaintiffs' were unrevealed to it, as was the case here for a considerable time after the withdrawal of these children. A final comment on the record is that the testimony of only three of the eleven pupil witnesses touches on general conditions in the school. This testimony tends to show that some of the classes were noisy. In my view, this evidence while disturbing enough, provides meager support for the chancellor's statement, approved by this court, that there was a "general lack of discipline and a great deal of confusion and noise existed during classes making it impossible for conscientious students to concentrate or to make full use of the learning processes." This is particularly so in the light of the Acting Superintendent's testimony that an inspection made by him shortly before the hearing disclosed no such conditions.
The School District of the City of Pittsburgh, like every other Pennsylvania school district, is required by law to take steps, insofar as reasonably feasible, to alleviate racial imbalance in its schools, regardless of cause. Pa. Human Relations Commission v. Chester School District, 427 Pa. 157, 233 A. 2d 290 (1967). It is subject to the orders of the Human Relations Commission promulgated under the Pennsylvania Human Relations Act, Act of Oct. 27, 1955, P.L. 744, as amended, 43 P.S. § 951, et seq. It has been cited by the Commission for violation of the Act by maintaining allegedly racially segregated schools and there is even now pending in this court an appeal from a Commission order directing it to produce plans for further integregation. Board of Education of the School District of Pittsburgh, Appellant v. Pennsylvania Human Relations Commission, Appellee, 568 C.D. 1971.
It is not the object of a preliminary injunction to provide the complainant with speedy relief, even where *656 his right to relief on the merits of his case might be clear and even where no effective answer seems possible. The purpose of the preliminary injunction is to maintain the last actual, peaceable, lawful, noncontested status which preceded the lawsuit. In this case that was the condition of affairs after the plaintiffs removed their children and while the Board was attempting to respond to the plaintiffs' complaints concerning Knoxville Junior High School. In the absence of imminence of action on the part of the Board to force the return of the children to the school, the court's restraint of the Board from so requiring was, as we have said, unnecessary.
But the chancellor went further. He ordered the Board to place the children in other schools. It is the law of Pennsylvania that a preliminary injunction may not be mandatory[1] except where necessary to restore the status quo which has been disturbed after suit begun[2] or to restore a peaceable condition drastically and forcibly altered just prior to suit.[3] Nor is this only ancient law. This court was reminded of the principles applicable to mandatory preliminary injunctions in McMullan v. Wohlgemuth, 444 Pa. 563, 281 A. 2d 836 (1971), where Justice O'BRIEN wrote: "In addition, the preliminary injunction granted here is to a certain extent mandatory in that it requires the Commonwealth to prepare a list containing certain information. Mandatory preliminary injunctions should be granted even more sparingly than those which are merely prohibitory. A preliminary injunction is generally simple preventive *657 maintaining the status quo until the rights of the parties are determined after a full examination and hearing. In Audenreid v. Phila. & Reading Railroad Co., 68 Pa. 370 (1871), we said that an interlocutory or preliminary injunction could not be mandatory. That rule, however, is not entirely without exception, but where exceptions are allowed, the rights of the plaintiff must be clear, or the defendant must change the status of the parties while the result is pending. Fredericks v. Huber, 180 Pa. 572, 37 A. 90 (1897); Cooke v. Boynton, 135 Pa. 102, 19 A. 944 (1890). We do not find in this case the exceptional circumstances which compel the granting of a preliminary injunction mandatory in nature. In Phila. Rec. Co. v. C.-M. News, Inc., 305 Pa. 372, 377, 378, 157 A. 796, 798 (1931), we said, with reference to a mandatory preliminary injunction: `This a court never grants except to prevent irreparable injury where the rights of the parties are entirely clear [citing cases], which they are not in the instant case.'" 444 Pa. at 572, 573, 281 A. 2d at 841. While the use in the above passage of the disjunctive rather than the conjunctive with reference to the two tests, i.e., clarity of right and change of position during or immediately prior to litigation, seems to be unsupported by earlier cases, the present case meets neither test. As to the first, the plaintiffs' children certainly have no clear right to attend a school other than that to which the Board has assigned them; indeed, they have no such right. As to the second, the Board had taken no action whatsoever to change the status of the parties following the removal of these children from Knoxville Junior High School.
This case illustrates the reason for the rule that such orders should not be made as preliminary relief. We are told that the Concord pupils are in other schools by reason of the order. The case has been effectively determined, *658 at least for this school year, without opportunity of answer or full inquiry into the facts; the Board has been stripped of its statutory power and thwarted in the performance of duties imposed upon it by law and public policy.
Furthermore, the remedy of injunction should be avoided where its use will have public consequence. In Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S. Ct. 643 (1941), black pullman porters as intervenors sought to enjoin the enforcement of a rule of the Texas Railroad Commission, the effect of which was that no sleeping car might be operated in that state unless a white conductor was in charge. Justice FRANKFURTER, writing for the Supreme Court which held the injunction to be an inappropriate remedy said:
"The complaint of the Pullman porters undoubtedly tendered a substantial constitutional issue. It is more than substantial. It touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open.

. . . .
"An appeal to the chancellor . . . is an appeal to the `exercise of the sound discretion, which guides the determination of courts of equity.' [Case cited.] The history of equity jurisdiction is the history of regard for public consequence in employing the extraordinary remedy of the injunction." 312 U.S. at 498, 500, 61 S. Ct. at 644, 645.
In United States ex rel. Greathouse v. Dern, 289 U.S. 352, 53 S. Ct. 614 (1933), plaintiffs sought by mandamus to compel the Secretary of War and the Chief of Engineers to authorize the construction of a wharf on the Potomac River. Justice STONE wrote:
"Although the remedy by mandamus is at law, its allowance is controlled by equitable principles, [citing cases].

. . . .
*659 "The Court, in its discretion, may refuse mandamus to compel the doing of an idle act [citing cases]; or to give a remedy which would work a public injury or embarrassment [citing cases] just as, in its sound discretion, a court of equity may refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest." 289 U.S. at 359, 360, 53 S. Ct. at 617.
In City of Harrisonville, Mo. v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S. Ct. 602 (1933), plaintiffs sought to enjoin operation of a polluting municipal sewer plant. Justice BRANDEIS wrote: "The discharge of the effluent into the creek is a tort; and the nuisance, being continuous or recurrent, is an injury for which an injunction may be granted. Thus, the question here is not one of equitable jurisdiction. The question is whether, upon the facts found, an injunction is the appropriate remedy. For an injunction is not a remedy which issues as of course. . . . Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling." 289 U.S. at 337, 338, 53 S. Ct. at 603, 604.
In McMullan v. Wohlgemuth, supra, Mr. Justice O'BRIEN further wrote: "In addition, where an adverse effect upon the public will result from the issuance of a preliminary injunction, it should not be granted. Berkowitz v. Wilbar, 82 Dauphin 357 (1964), affirmed 416 Pa. 369, 206 A. 2d 280 (1965). In this case, the court refused to enjoin the dismissal of a state employee on the ground that the importance of not interfering with the administrative function of the state government outweighed the necessity for a preliminary injunction." 281 A. 2d at 841.
That the matter was of public concern in Pittsburgh is demonstrated by the following editorial which appeared in the Pittsburgh Post-Gazette on Saturday, November 6, 1971:

*660 "Knoxville: The Teachers' Side
"Another side to the story at Knoxville Junior High School has come out with the announcement by the Pittsburgh Federation of Teachers (PFT) that it is backing the teachers there in their `deep and genuine commitment to their work at Knoxville and to the welfare of the school and its students.'
"Up to now the center of the stage has been held by parents from the Concord elementary district protesting their youngsters being reassigned from Overbrook to Knoxville. These parents won a court victory when Judge CHARLES D. McCARTHY granted a temporary injunction and ordered the Board of Public Education to reassign the pupils elsewhere. The dissident parents have suspended their protest and will permit their children to attend Prospect and South Hill Schools, pending decisions by the courts and Legislature.
"But what has been overlooked was the effect of this on faculty and students at Knoxville where continuing efforts are being made to solve problems and get on with the business of a good education.
"The statement by the PFT points out that there continue to be some 300 white students presently in attendance at Knoxville Junior High out of the total enrollment of approximately 850 students. `There is widespread parent support, among both white and black parents, for Knoxville Junior High, as well. . . .'
"The teachers at Knoxville wish it made totally clear that they feel a deep and genuine commitment to their work at Knoxville and to the welfare of the school and of its students. They wish it known that the educational program, the atmosphere, and the conditions of student safety at Knoxville are at least equal to those at other city schools. . . . Knoxville teachers feel sincerely concerned and let down that the impression has been created, and augmented by Judge McCARTHY'S *661 temporary action, that their school is somehow inferior to any other city school. They want that image corrected immediately.
"It is significant that the Concord parents have dwelt upon safety, not busing, the usual `hedge' in racial situations. The reason they could not use `busing' is because their children were bused last year, as this.
"But it is too bad that in their resistance they are creating an unfortunate impression about Knoxville. It is worthy of note that teachers across the city, many engaged in difficult integration situations of their own, have rallied to back their Knoxville compatriots caught in a crossfire while doing their best.
"We say again as we have before that if the Concord parents had spent one-tenth the energies in helping Knoxville that they have in fighting it, the entire story would have been quite different."
Misunderstanding, prejudice, dissatisfaction and, indeed, hostility among the races constitute the major weakness in contemporary American society. At no point in our corporate life are they more intensely felt or more productive of public injury than at the time and place we educate our children. We have entrusted this most sensitive function to the care of our school boards and the trained professionals they employ. Among the many powers we have given these authorities is that of assigning pupils to schools as they may deem best. Section 1310 of the Public School Code of 1949, March 10, P.L. 30, 24 P.S. § 13-1310. With reference to the imposition of judicial power upon school boards, our Supreme Court, by Justice KEPHART, has written: "Executive officers of municipal and school districts have many discretionary powers in performing their functions; ordinarily, courts will not interfere with this exercise, but if it appears their action is based on a misconception of law, ignorance through lack of inquiry *662 into facts necessary to form intelligent judgment or the result of arbitrary will or caprice, courts will intervene to prevent an abuse of power adverse to public welfare. Executive officers are clothed with the responsibility of originating and executing plans for the public good; the presumption is that their acts are on such considerations and their decisions reached in a legal way after investigation. When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden; courts can and will interfere only when it is made apparent this discretion has been abused. Abuse of discretion does not, as a rule, come from unwise acts or mistaken judgment, but generally springs from improper influences, a disregard of duty, or a violation of law." Hibbs v. Arensberg, 276 Pa. 24, 26, 27, 119 A. 727, 728 (1923).
In Regan v. Stoddard, 361 Pa. 469, 474, 65 A. 2d 240, 242 (1949), the following statement of the law was approved: "`We must reiterate that a court is not a super Board of directors with superior knowledge of the administration of business, finance, or the science of pedagogics. It would be presumptuous to superimpose judicial control upon the exercise of discretion by trained educators. The legislature has vested wide powers in the Board of school directors under the Act of May 18, 1911, P.L. 309, Sec. 1608, 24 P.S. 1552; Sec. 2222, 24 P.S. 1992, Sec. 1414, 24 P.S. 1421, with respect to the very matters which are now in issue. Our appellate courts repeatedly have affirmed their exercise of this discretion. Day v. Amwell Township School District, 283 Pa. 248; Hibbs v. Arensberg, 276 Pa. 24; Lamb v. Redding, 234 Pa. 481. In the latter case, judicial interference was confined to those cases where it was "apparent that it is not discretion that is being exercised but arbitary will or caprice."'" And further, in Detweiler v. Hatfield Boro. School District, 376 Pa. *663 555, 566, 104 A. 2d 110, 116, 117 (1954), we read the following: "School districts are amenable to a court of equity by way of injunction when their acts transcend the legal limits that bind their powers. However, we have never questioned the policies of school directors where the board acts within the scope of its statutory authority and in good faith: [citing cases]."
Finally, based on rather similar facts, there is authority contradictory of the result here. In Landerman v. Churchill Area School District, et al., 414 Pa. 530, 200 A. 2d 867 (1964), parents sought a mandatory injunction which would have compelled a school district to restore bus routes on the ground that their children's safety was endangered by revised routes requiring them to walk along hazardous highways. Our Supreme Court affirmed the dismissal of the complaint upon a demurrer. Justice ROBERTS wrote for a unanimous court:
"The Public School Code of 1949, March 10, P.L. 30, § 1361, 24 P.S. § 13-1361, provides: `The board of school directors in any school district may, out of the funds of the district, provide for the free transportation of any resident pupil to and from the public schools and to and from any points in the Commonwealth in order to provide tours for any purpose connected with the educational pursuits of the pupils. They shall provide such transportation whenever so required by any of the provisions of this act or of any other act of Assembly.'
"In order for a court of equity to grant relief, it must clearly be shown that the school board acted outside the scope of its statutory authority or not in good faith. `It is only where the board transcends the limits of its legal discretion that it is amenable to the injunctive processes of a court of equity: [citing cases].'
"The burden of showing such a clear abuse of discretion is a heavy one. [Citing cases.] Even assuming, *664 as we must, that all well-pleaded allegations of fact (but not conclusions of law) in the complaint are admitted by defendants' preliminary objections, Bechak v. Corak, 414 Pa. 522, 201 A. 2d 213 (1964), plaintiffs have failed to allege facts sufficient to justify the intervention of equity into this controversy." 414 Pa. at 534, 200 A. 2d at 868, 869.
As noted, in compliance with the order below the Board has placed plaintiffs' children in schools other than Knoxville Junior High School. I would not subject them to a second interruption of their education during this school year. I would by appropriate decree reverse the order of the court below but postpone the effect of such reversal until the end of the current school term, hopeful that time and reason, rather than judicial command, may resolve this melancholy controversy in the best interests of all of the pupils of Knoxville Junior High School.
Judges WILKINSON and BLATT join in this opinion.
NOTES
[1] Audenreid v. Philadelphia & Reading R.R., 68 Pa. 370 (1871); Emerman v. Baldwin, 186 Pa. Superior Ct. 561, 142 A. 2d 440 (1958).
[2] Washington Borough v. Steiner, 19 Pa. Superior Ct. 498 (1902); O'Donnell v. Lehigh Navigation Coal Co., 324 Pa. 369, 188 A. 348 (1936).
[3] L.P. Whiteman v. Fayette Fuel-Gas Co., 139 Pa. 492, 20 A. 1062 (1891).