Zebra *v.* Pittsburgh School District, Appellant.

434

Argued September 26, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Justin M. Johnson,* Solicitor, with him *Thomas J. Cox, Jr.,* and *Bernard Markovitz,* Assistant Solicitors, for appellant.

*Paul G. Kachulis,* with him *John V. Adams, Jr.* and *Kachulis, Copetas, Adams & Hillen,* for appellees.

OPINION BY MR. CHIEF JUSTICE JONES, November 17, 1972:

In June of 1971 the Board of Public Education of the School District of Pittsburgh adopted a school reorganization plan which altered the enrollment pattern of a number of city schools. The reorganization

was to take effect at the beginning of the 1971-72 school year. The instant controversy arose out of a provision of the plan which assigned all students who completed sixth grade at the Concord Elementary School to seventh grade at Knoxville Junior High. Prior to the reorganization, students who completed sixth grade at Concord were assigned to seventh grade at Overbrook Elementary School. As a result of the changes made by the plan, the racial balance was improved at Knoxville and Overbrook and overcrowding at both schools was reduced. After the reorganization, Knoxville was still a predominantly black school; thirty to thirty-five percent of the 835 students enrolled at Knoxville were white. Most if not all of the Concord area students who were assigned to Knoxville were white. In addition to improving the racial balance and reducing overcrowding, this transfer was part of an overall plan to establish a city-wide system of "middle schools" which would include grades six through eight.

Prior to the opening of school in September of 1971, several parent-teacher meetings were held, including an open house at Knoxville, to acquaint the parents with the school. On September 7th school opened as scheduled without incident. During the next two weeks, however, a series of unpleasant incidents occurred involving violence, threats, harassment and intimidation directed against some of the students from the Concord area. On September 23rd there was a power failure in the area of the City in which the school is located and there were rumors that there might be a riot after school. Although nothing else untoward happened on the 23rd, on the next day there was a false fire alarm at the school. On that day, a Friday, the Concord area parents withdrew their children from school en masse. The following Monday, September 27th, 1971, the parents gathered at the Overbrook Elementary School and demanded that their children be enrolled in the seventh

grade of that school. During the next two weeks there were several meetings between the Concord area parents and school officials, including the principal of Knoxville Junior High School, the Acting Superintendent of the school system, and members of the School Board. No solution was reached.

On October 8th, 1971, the school directors met and authorized the Acting Superintendent to take whatever steps were necessary to insure the safety and welfare of all the children attending Knoxville. On October 13th, 1971, the principal of Knoxville sent a letter to each of the families whose children had been withdrawn from school requesting their cooperation in returning their children to school. The letter advised the parents that steps were being taken to insure the safety and welfare of their children. On the same day the parents filed a complaint in equity in the Allegheny County Court of Common Pleas seeking to enjoin the school district from compelling their children to attend the Knoxville School and to require the assignment of the children to the Overbrook School.

A hearing to determine whether a preliminary injunction should issue was held on the 19th and 20th of October and, on October 26th, 1971, the court filed a decree preliminarily enjoining the defendant school district from requiring the children of the forty-seven Concord area plaintiffs to attend Knoxville and requiring the defendant to provide other school facilities for their children. The school district appealed the preliminary decree of the lower court to the Commonwealth Court, which affirmed. *Zebra v. School District of the City of Pittsburgh,* 4 Pa. Commonwealth Ct. 642, 287 A. 2d 870 (1972) (ROGERS, J., joined by WILKINSON and BLATT, JJ., dissenting). We granted allocatur.

The injunction appealed from is both preliminary and mandatory. As we have stated many times before, the scope of appellate review of the entry of prelimi-

nary injunctions is limited to determining if there were any apparently reasonable grounds for the action of the court below. *McMullan v. Wohlgemuth,* 444 Pa. 563, 570, 281 A. 2d 836, 840 (1971); *Keystone Guild, Inc. v. Pappas,* 399 Pa. 46, 49, 159 A. 2d 681, 683 (1960); *Herman v. Dixon,* 393 Pa. 33, 36, 141 A. 2d 576, 577 (1958). In order to sustain a preliminary injunction the plaintiff's right to relief must be clear, the need for relief must be immediate, and the injury must be irreparable if the injunction is not granted. *Keystone Guild, Inc. v. Pappas,* supra. Furthermore, when a preliminary injunction contains mandatory provisions which will require a change in the positions of the parties, it should be granted even more sparingly than one which is merely prohibitory. *McMullan v. Wohlgemuth,* supra.

Courts are further restrained, when dealing with matters of school policy, by the long-established and salutary rule that the courts should not function as super school boards. We will not interfere with the discretionary exercise of a school board's power unless the action was based on "a misconception of law, ignorance through lack of inquiry into the facts necessary to form an intelligent judgment, or the result of arbitrary will or caprice." *Hibbs v. Arensberg,* 276 Pa. 24, 26, 119 A. 727, 728 (1923). "It is only when the board transcends the limits of its legal discretion that it is amenable to the injunctive processes of a court of equity." *Landerman v. Churchill Area School District,* 414 Pa. 530, 534, 200 A. 2d 867, 869 (1964); *Detweiler v. Hatfield Borough School District,* 376 Pa. 555, 566, 104 A. 2d 110, 116-17 (1954). The burden of showing such an abuse is a heavy one and rests with the party seeking the injunction. *Hibbs v. Arensberg,* supra.

There is no need to detail the individual acts of abuse testified to by the eleven students who appeared at the initial hearing. Their testimony is fully set out

in the opinion of the trial court and in the majority opinion of the Commonwealth Court. *See, Zebra v. School District of the City of Pittsburgh,* 4 Pa. Commonwealth Ct. 642, 648-50, 287 A. 2d 870, 872-73 (1972). Ample testimony was presented at the initial hearing to support a finding that during the first two weeks of school the Knoxville Junior High School was beset with major problems in need of correction. The testimony of individual acts of violence, threats and general harassment directed against some of the Concord area students has never been seriously questioned; nor can it be denied that a parent is justified in withdrawing his child from a school where the health and welfare of the child is threatened. However, the testimony presented at the hearing did not establish a clear right in the plaintiffs or a need for immediate relief, and it certainly did not indicate the presence of any bad faith or misconduct on the part of the school directors sufficient to justify judicial intervention in their discretionary function of pupil assignment.[1]

The primary basis for the injunction granted by the trial court and affirmed by the Commonwealth Court was a belief that the health and welfare of the Concord area students would be endangered if they were forced to return to the Knoxville School. Although only eleven students testified at the hearing, the injunction which was granted applied to all forty-seven students who were assigned to Knoxville from the Concord area. While there was some testimony that the

---

[1] Although we have uniformly applied the rule that appellate courts will not review the facts on appeal from a preliminary injunction, "[i]t is clearly settled that an appellate court is able to draw its own inferences, deductions and conclusions, as well as determine the proper legal interpretation to be placed upon the evidence; and this is especially true when plaintiffs' material testimony has not been contradicted or impeached." *West Penn Township School District v. IBEW,* 396 Pa. 408, 413, 145 A. 2d 258, 260 (1958).

conditions at Knoxville were not conducive to good education,[2] most of the testimony presented at the hearing described instances of misconduct by individual students against the witnesses. There was no evidence that any other children attending Knoxville from the Concord area had any difficulty nor was there evidence that the abuses visited upon the children who testified were inflicted because they came from Concord. In the absence of clear evidence indicating that the students who testified were singled out for abuse because they came from Concord or evidence that similar attacks against other Concord students could be anticipated, the sweeping injunction requiring the reassignment of all Concord area students was unwarranted.

Secondly, the injunction was improvidently granted because it was based entirely on incidents which had occurred almost a month prior to the hearing. The plaintiffs admitted that they had no knowledge of conditions at Knoxville after September 24th. However, school officials testified that, as a result of the earlier trouble and the negotiations with the parents, additional guidance, activity and security personnel had been added at Knoxville to insure that the plaintiffs' children could return without fear. Furthermore, school officials testified that there was eighty-five to eighty-

---

[2] As noted by Judge ROGERS' dissenting opinion in the Commonwealth Court, only three of the student witnesses testified about general conditions at Knoxville, including allegations of noisy classrooms and general disorder. We concur with Judge ROGERS' assessment that "this evidence, while disturbing enough, provides meager support for the chancellor's statement . . . that there was a 'general lack of discipline and a great deal of confusion and noise existed during classes making it impossible for conscientious students to concentrate or to make full use of the learning processes.'" *Zebra v. School District of the City of Pittsburgh,* 4 Pa. Commonwealth Ct. 642, 655, 287 A. 2d 870, 875 (1972) (dissenting opinion).

seven percent attendance at Knoxville after the Concord students were withdrawn and that classes were proceeding normally. Since all of the most recent evidence tended to show that conditions had improved, and the plaintiffs made no showing that the problems they complained of had not already been corrected, they did not present the clear right to relief necessary to sustain the granting of a preliminary injunction.

Thirdly, the plaintiffs' evidence does not show that they were in need of immediate injunctive relief. Although the plaintiffs had voluntarily withdrawn their children from school, no action had been taken against them for the non-attendance of their children. In fact, there was a statement by the school board that no action would be taken pending determination of the case. A preliminary injunction, properly applied, is designed to preserve the matter at issue until there can be a full hearing and disposition of all the issues. In this case, however, the mandatory provisions of the injunction which was granted resulted in a significant change in the status of the parties. In accord with the injunction, the Concord area students were assigned to other schools for the balance of the 1971-72 school year.

Finally, it was error for the trial court to intervene in a matter reserved by the legislature for the local school board where there was no evidence of illegality or bad faith on the part of the school board. The Public School Code of 1949 grants local school boards broad powers in the organization and administration of local schools, including the power to "classify and assign the pupils in the district to any school or schools therein as it may deem best, in order to properly educate them."[3] Judicial interference with a school board's performance of its discretionary duties can only be

[3] Act of March 10, 1949, P. L. 30, Art. XIII, §1310, *as amended*, 24 P.S. §13-1310.

sustained where it is clearly shown that the school board acted outside the scope of its statutory authority or in bad faith. *Landerman v. Churchill Area School District,* supra, 414 Pa. at 534, 200 A. 2d at 869. Assigning the Concord area students to Knoxville was clearly within the school board's statutory power and there has never been any allegation or evidence of bad faith. In fact, there was uncontested testimony at the hearing that official efforts to implement the school reorganization plan successfully began well before the start of school in 1971 and continued until the time of the hearing.

The assignment of school students to classes in a particular building within the school district is a task to which school boards are particularly well suited. In recent years the assignment has become even more complex as considerations of racial balance have been added to the other factors of distance and space available. Judicial interference with this procedure must be strictly limited to instances of bad faith, abuse of discretion or illegality. The lower court erred in granting the preliminary injunction. The plaintiffs did not demonstrate either a clear right to immediate relief or that irreparable harm would result if their children were returned to Knoxville under the conditions that existed at the time of the hearing; nor did they show any improper action by the school board.

The decree of the Common Pleas Court of Allegheny County is reversed and the preliminary injunction appealed from is vacated.

Costs on appellees.

Mr. Justice EAGEN concurs in the result.