## McDermott v. Board of Commissioners

*Stanley J. Lieberman*, for plaintiff.
*John S. Halsted*, for defendants.

SUGERMAN, *J.*, August 19, 1974—In support of its order in the matter captioned, entered the 19th day of August, 1974, discharging the rule to show cause and dismissing plaintiff's complaint, the court renders the following

## OPINION

Plaintiff, a member of the Board of Commissioners of Chester County, and also a member of the Chester County Government Study Commission (hereinafter sometimes, the "Study Commission"), seeks by rule to show cause heretofore granted upon defendant Board of Commissioners and Study Commission a permanent injunction prohibiting the printing and distribution of a brochure entitled "Now It's Up To You," as well as the appropriation and expenditure of funds therefor.

Pursuant to an ordinance enacted February 20, 1973, and in accordance with the provisions of the Act of April 13, 1972, P.L. 125 (No. 62), secs. 101, et seq., 53 P.S. §§1-101, et seq. (hereinafter, "Act No. 62"), the Board of Commissioners of Chester County caused to be submitted to the electorate, at a primary election held on May 15, 1973, the question of whether a government study commission should be elected to study the form of Government of Chester County and consider the advisability of adopting an optional plan of government or a home rule charter.

The question was approved and on May 15, 1973, a government study commission of nine members was elected. The Study Commission so formed commenced its work and issued its final report and recommendations on February 13, 1974, as mandated by section 210 of Act No. 62, 53 P.S. §1-210. The Study Commission delivered copies of the same to the Clerk of the Board of Commissioners of Chester County for "public study and information" and dissemination to interested citizens, and caused a copy of the report to be filed with the Department of Community Affairs of the Commonwealth of Pennsylvania.

The report recommended a change in the structure of County Government by the adoption of an optional plan known as the "Council-Manager" form of government and further recommended that the question of adopting such plan be submitted to the electorate by referendum at the general election to be held on November 5, 1974.

Although six members of the Study Commission joined in the recommendation, the report was not unanimous. Commissioner McDermott, plaintiff herein, by statement entitled "Minority Report"

appearing on page 32 of the report, espoused the development of a home rule charter and recommended election by the electorate of a chief executive as well as election of county commissioners by district rather than "at large" as proposed by the majority of the Study Commission. Commissioner Edna H. Clark concurred with plaintiff, by statement appearing on pages 34 and 34a of the report, and Commissioner John W. McIntire, in disagreement with recommendations of both the majority and minority members of the Study Commission, recommended no change in the present form of County Government.

On March 11, 1974, subsequent to the completion of the final draft of the final report and recommendations, but apparently prior to the printing thereof, at a duly convened meeting of the Study Commission with all members present excepting Commissioner McIntire, a resolution was unanimously adopted approving the distribution of a brochure similar to that in issue to all registered voters in Chester County. The brochure is purported to be a brief summary of the final report and recommendations of the Study Commission and is designed to inform the county electorate that the question as proposed by the Study Commission will appear on the ballot. The brochure further sets forth succinctly the bases for the Study Commission's recommendations and, in limited detail, describes the mechanics of the proposed new form of County Government.

At the same meeting, the chairman advised all present that a draft of the brochure would be circulated to all commissioners "for comment." A draft was thereafter circulated, followed by a printer's proof incorporating certain changes in copy

suggested by plaintiff. The proof contained, inter alia, the following language:

"Commissioners McDermott and Clark voted against the recommendation, favoring instead a plan which would provide for the election of a chief executive and election of Commissioners by district."

Shortly thereafter, apparently as the result of objections to the quoted copy registered by some commissioners, a second printer's proof was circulated to all commissioners containing the following in place of the quoted copy:

"In February, 1974, the Study Commission issued its final recommendation based upon its months of study with Commissioners Baker, Ehmer, Lynch, Mulford, Rapp and West supporting the Council-Manager Optional Plan. Commissioners McDermott and Clark voted for a home rule charter."

At a meeting of the Study Commission held on July 30, 1974, with all members present excepting Commissioner Clark, the amended language was approved by seven commissioners, plaintiff casting the only negative vote. In due course, the Board of Commissioners of Chester County authorized and directed the printing and mailing of 80,000 copies of the brochure as so approved, and printing commenced. The instant complaint and rule seeks to enjoin such printing and mail distribution. At the time of hearing, 50,650 copies had been fully printed, but all work was suspended upon service of the rule and remains in suspension awaiting the decision of the court.

Plaintiff initially challenges the authority of the Study Commission to print the brochure, and the

authority of the Board of Commissioners to appropriate the funds necessary to underwrite the project, contending that inasmuch as the Study Commission has completed and filed its final report and recommendations, it may no longer lawfully function. Such argument is apparently based upon a literal construction of sections 209, 210 and 211 of Act No. 62.

Section 209 of Act No. 62 requires the Study Commission to hold public hearings and "provide for the widest possible public information and discussion respecting the purposes and progress of its work." Section 210 requires the Study Commission to report its findings and recommendations to the public by publishing its final report. Section 210 also directs the filing of a copy of the final report with the Department of Community Affairs of the Commonwealth of Pennsylvania.

Plaintiff argues that such requirements have been complied with and, as a result, the Study Commission has no further function under the law and is, in fact, a sterile body, patiently awaiting its statutory discharge. The argument withstands neither the tests of logic nor the law itself.

Firstly, section 211 of Act No. 62, as recently amended, July 3, 1974, P.L. 437 (No. 149), 53 P.S. §1-211, while requiring the Study Commission to be discharged upon the filing of its report, further provides that if the Study Commission's recommendations require a referendum, as in the case at bar, the Study Commission shall *not* be discharged until such referendum has been finally concluded. Accordingly, the Chester County Government Study Commission may not be discharged until, at the earliest, November 5, 1974, the date fixed for the referendum. More importantly, section 211 of Act

No. 62 provides that the Study Commission may, *at any time prior to sixty days before the date of such referendum*, modify or change any recommendation set forth in its final report by publishing an amended report.

Thus, the Chester County Government Study Commission, at least until September 5, 1974, some three weeks hence, is very much alive and may continue to perform its work notwithstanding the filing of its report and recommendations. And while there is no specific language in Act No. 62 authorizing the Study Commission to prepare, publish and circulate a brochure summarizing its report and recommendations, such authority appears by implication in at least two sections of Act No. 62. Section 209 as quoted above, *directs* the government study commission to disseminate information publicly concerning the purposes and progress of its work. The brochure here in issue is obviously intended to carry out such direction, at minimal cost to the county.

Section 210 requires the Study Commission to publish sufficient copies of its final report for "public study and information." The brochure itself advises that such report is available to all interested citizens and indicates how and where copies may be obtained. The brochure implements the obvious and stated purpose of section 210: to give the report and recommendations of the Study Commission the widest possible distribution.

The Study Commission has recommended wide ranging changes in the present structure and operation of County Government. Such recommendations, if adopted and implemented, may well affect every resident of Chester County. Certainly it is in the public interest that before voting upon the pro-

posals of the Study Commission, the electorate be as fully informed as is possible. The Study Commission has endeavored to provide every voter in Chester County with at least a brief summary of its Report and Recommendations. We find such endeavor not only lawful, and within the power and authority of the Study Commission as bestowed upon it by the cited sections of Act No. 62, but indeed a salutary and worthy effort, entirely consistent with the noble traditions of this great and historic county.

Having found the preparation, printing and distribution of the brochure to be proper and within the purview of Act No. 62, it follows that the appropriation or expenditure of funds for such purpose by the Board of Commissioners of Chester County is lawful as well.

The narrow issue remaining, then, is whether harm or injury is visited upon plaintiff, as an individual, by reason of the inclusion within the brochure of the allegedly offending phrase, "Commissioners McDermott and Clark voted for a home rule charter" while at the same time omitting plaintiff's reasons for opposing the Study Commission's recommendations. In this context, it is essential to note that plaintiff, in equity, seeks a permanent injunction.

The power of a court sitting in equity to issue an injunction should be exercised with an abundance of caution, and only where reason and necessity for such relief are clearly established: Rick v. Cramp, 357 Pa. 83, 53 A. 2d 84 (1947). An injunction is a drastic and extraordinary remedy, to be granted or denied in the sound discretion of the court: Cheswick Borough v. Bechman, 352 Pa. 79, 42 A. 2d 60 (1945), and only to prevent great and irreparable harm: Ladner v. Siegel, 298 Pa. 487, 148 Atl. 699

(1930). Conduct which cannot result in injury, although irregular or unauthorized, does not constitute a ground for injunctive relief: Haig Corp. v. Thomas S. Gassner Co., 163 Pa. Superior Ct. 611, 63 A. 2d 433 (1949), and an injunction should not be granted where it will work greater injury than the wrong from which redress is sought: Huckenstine's Appeal, 70 Pa. 102 (1872).

It is particularly pertinent to note that an injunction is a matter of grace, not of right: Vitacolonna v. Philadelphia, 382 Pa. 399, 115 A. 2d 178 (1955). The question in each case must depend upon the circumstances out of which it grows, and the court in determining whether injunctive relief is warranted, must consider the conduct of the parties, the harm sought to be remedied and the equities involved: Lehigh Valley Coal Company v. Lentz, 228 Pa. 346, 77 Atl. 511 (1910). Lastly, in order to obtain an injunction, the moving party must establish actual and substantial injury, done or threatened to be done, by clear and convincing proof: Brown v. Lehman, 141 Pa. Superior Ct. 467, 15 A. 2d 513 (1940). Trifling annoyances cannot form the basis for injunctive relief: Zebra v. School District of City of Pittsburgh, 4 Pa. Commonwealth Ct. 642, 287 A. 2d 870 (1972), reversed on other grounds, 449 Pa. 432, 296 A. 2d 748.

It is undisputed that Act No. 62 neither directs nor even contemplates the publishing or filing of "minority" reports or of the individual views or comments of each member of a government study commission. Accordingly, the study commission need not have permitted plaintiff's "Minority Report" to be published in the commission's final report, and of course, need not have made reference to plaintiff's views in the brochure. Plaintiff ar-

gues, however, that once having published plaintiff's views in its final report, the commission has "set a precedent" and is bound to publish such views in all printed matter distributed to the public. Unfortunately, the logic and reason upon which this argument is based escape us, and plaintiff has cited no authority persuading us to adopt his view; nor has plaintiff convinced the court that once allusion is made to plaintiff in the brochure, all of his views must then be set forth. Such logic, carried to its natural extreme, might well prohibit the dissemination of any information whatever because of the sheer bulk and prohibitive cost of the printed matter.

It is instructive to note that plaintiff, in his "Minority Report" suggests:

"The study of the existing government of Chester County has shown that it could be strengthened, made more efficient, more economical and more responsive. *I feel the best way to achieve all these objectives is through the development of a home rule charter*, since it is only through a charter that the additional strength of self-determination can be obtained, and only through a charter that the provisions of initiative, referendum and recall may be instituted." (Emphasis supplied.)

It is difficult to conceive of language designed to more clearly and succinctly convey the impression that plaintiff does indeed support the adoption of a home rule charter. The brochure does no violence to plaintiff's position, but merely reports it. Nor can we say that the failure of the brochure to disclose the reasons why plaintiff opposed the majority recommendation in any manner distorts plaintiff's position on a home rule charter. In short, the court fails to perceive any threatened harm or injury to

plaintiff whatever. If harm or injury is threatened, certainly it cannot under any construction be of the substantial and positive character necessary to permit the extraordinary relief demanded by plaintiff: Gillespie v. American Zinc & Chemical Co., 247 Pa. 222, 93 Atl. 272 (1915). Equity will not concern itself with matters de minimis: Food Fair Stores v. Kline, 72 Dauph. 175, affirmed 396 Pa. 397, 152 A. 2d 661 (1959), and, as a general rule, an injunction will be refused where the benefit to the complainant is entirely disproportionate to the injury suffered by the respondent: Moyerman v. Glanzberg, 391 Pa. 387, 138 A. 2d 681 (1958), or where greater injury would result from issuing the injunction than from denying it: Quinn v. American Spiral Spring & Mfg. Co., 293 Pa. 152, 141 Atl. 855 (1928). The case at bar presents a factual setting demanding application of the general rule. On balance, the harm to the electorate of Chester County resulting from the failure to distribute the informative brochure in the event plaintiff were to prevail far outweighs the alleged injury to plaintiff occasioned by the failure to set forth plaintiff's singular views.