School District of the City of Pittsburgh, Appellant, *v.* Robert Zebra, Myles M. Bishop, Edward W. Clegg, Dush Kosanovich, Bernard J. Majeski, Kenneth R. McDonald, Robert M. Wilkinson, William F. Bell, John Lazor, Kenneth E. Asbury, Leo J. Bakalarski, William J. Kasten, Wendell Papp, James Roy Cummings, Charles W. Davis, Sr., Mathew Dawida, Ronald H. Freudenberg, George T. Leary, Jr., Michael J. Manko, James J. Montgomery, Theresa B. Potenziani, August J. Rostek, Ralph E. McGee, William F. Besselman, Jr., Edward J. Schimmel, James W. Everitt, Henry G. Huebner, Andrew Veri, Jr., Joseph P. Chesney, Michael Czarny, John J. Soroka, Eugene A. Woods, Harry J. Moslander, Donald J. Wislich, Joseph G. Dusch, William A. Knetzer, Bogdan Mural, Raymond Sager, John A. Strazdins, Frank S. Haines, George S. Everman, Paul D. Graham, William G. Harrer, George Maravich, William L. Rust, Joseph F. Stridnicki and Donald A. Miller, Appellees.

204

Argued May 7, 1974, before President Judge BowMAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Persifor S. Oliver, Jr.,* Assistant Solicitor, with him *Justin M. Johnson,* Solicitor, for appellant.

*John V. Adams, Jr.,* with him *Paul G. Kachulis* and *Kachulis, Copetas, Adams & Hillen,* for appellees.

OPINION BY JUDGE BLATT, September 10, 1974:

On June 15, 1971, the Board of Public Education of the School District of Pittsburgh (Board of Education) adopted a school reorganization plan according to which children who had completed the sixth grade at Concord Elementary School (Concord) were to continue their education at Knoxville Junior High School (Knoxville) for grades seven through nine. Previously, such children would have been assigned to Over-

brook Elementary School (Overbrook) for the seventh and eighth grades.

Before school opened in September of 1971, there was considerable discussion and other communication among the parents of the children reassigned, and the faculty and administration at Knoxville and the Board of Education. Two "open house" meetings were held during the summer and, at least partially as a result of these meetings, the physical conditions at Knoxville were measurably improved.

School opened at Knoxville on September 7 and the Concord graduates complied at that time with the reorganization plan by attending classes at Knoxville. During the first three weeks of school, however, some of the Concord children encountered difficulties. Eleven of them later testified that they were subjected to harassment by other students, including a number of violent assaults and extortionary threats. On September 23 there were rumors circulating through the school to the effect that there was to be a riot on the following day, and a false fire alarm on September 24 may have caused some students to become frightened. At any rate, at a meeting at Overbrook on September 27 forty-seven parents or legal guardians of children who had attended Concord and were now attending Knoxville withdrew their children from Knoxville and demanded reassignment to Overbrook. After several further meetings involving parents, school officials and Board of Education representatives, the parents gained an audience before the Board of Education on October 2 at Concord where they orally presented their grievances concerning the safety of their children at Knoxville.

On October 8 the school directors met and authorized the Acting Superintendent of the school system to take whatever steps were necessary to insure the safety and welfare of all the children attending Knoxville. On October 13 the principal of Knoxville sent a letter to

each of the families whose children had been withdrawn, advising them that appropriate safety measures were being taken and requesting their cooperation in having the children returned to Knoxville. On that same day, the parents concerned filed a complaint in equity in the Court of Common Pleas of Allegheny County against the School District of the City of Pittsburgh to enjoin its continuing implementation of the school reorganization plan and to require reassignment of the plaintiffs' children to Overbrook.

After a hearing, the court issued a preliminary injunction on October 26 preventing the Board of Education from requiring the plaintiffs' children to attend Knoxville. The court also mandated that the Board of Education permit the children to attend Overbrook or any other similar and conveniently located school facility of the defendant School District. This order was affirmed by this Court in *Zebra v. School District of the City of Pittsburgh,* 4 Pa. Commonwealth Ct. 642, 287 A. 2d 870 (1972). It was reversed, however, in an opinion filed by the Supreme Court of Pennsylvania on November 17, 1972, and the preliminary injunction was vacated. *Zebra v. School District of the City of Pittsburgh,* 449 Pa. 432, 296 A. 2d 748 (1972).

Meanwhile, after a final hearing upon the original complaint in equity was held in the Court of Common Pleas between May 11 and May 18, 1972, the Chancellor filed an adjudication on September 14, 1972, ordering that the preliminary injunction should be made permanent and that the plaintiffs should be entitled to affirmative relief. The Chancellor also filed a Decree Nisi according to which the school directors and the School District of the City of Pittsburgh were enjoined from forcing the children of the plaintiffs to attend classes at Knoxville. He also ordered that the injunction remain in full force and effect until such time as the school directors and the School District of

the City of Pittsburgh might convince the court that the environment at Knoxville had become such as to be conducive to the learning process and one which is not adverse to the health, safety and general welfare of the students. The School District filed exceptions to the adjudication and, on August 21, 1973, the court en banc filed a final adjudication affirming the Chancellor. From this final decree an appeal has been taken to this Court.

Our scope of review from a lower court's issuance of a permanent injunction is limited. We will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case nor pass upon the reasons for or against such action unless it is plain that no such grounds existed or that the rules of law relied upon were palpably wrong or clearly inapplicable. *Armstrong School District v. Armstrong Education Association*, 5 Pa. Commonwealth Ct. 378, 291 A. 2d 120 (1972). It must be remembered, however, that the issuance of an injunction is an extraordinary remedy. *Commonwealth v. National Gettysburg Tower, Inc.*, 8 Pa. Commonwealth Ct. 231, 302 A. 2d 886 (1973). The power of the courts to issue injunctions should be exercised with great caution and only where the reason and necessity therefor have been clearly established. *Rick v. Cramp*, 357 Pa. 83, 53 A. 2d 84 (1947). And, of course, one seeking an injunction must establish a clear legal right, not doubtful or uncertain. *McDonald v. Noga*, 393 Pa. 309, 141 A. 2d 842 (1958).

Moreover, when a court is reviewing the exercise of discretion by a school board, the court must act with special caution. "The burden to show a school board has abused its discretion is a heavy one, sustained only when it is apparent that it has substituted arbitrary will or caprice for sound considered judgment." *York v. Montrose Area School District*, 9 Pa. Commonwealth

Ct. 379, 382, 307 A. 2d 478, 479 (1973). "It is only where the board transcends the limits of its legal discretion that it is amenable to the injunctive processes of a court of equity." *Landerman v. Churchill Area School District*, 414 Pa. 530, 534, 200 A. 2d 867, 869 (1964).

In vacating the preliminary injunction in this case, the Supreme Court of Pennsylvania concluded that the testimony presented at the preliminary hearing before the Chancellor "certainly did not indicate the presence of any bad faith or misconduct on the part of the school directors sufficient to justify judicial intervention in their discretionary function of pupil assignment." *Zebra, supra,* 449 Pa. at 438, 296 A. 2d at 751. At the final hearing before the Chancellor there was considerable testimony concerning the conditions at Knoxville Junior High School and individual instances of misconduct on the part of students there. However, there was virtually no new testimony on the fundamental question as to bad faith or misconduct on the part of the school board.

It is clear that the reorganization plan was implemented in order to achieve three main purposes. First, it was part of an overall attempt to establish throughout Pittsburgh a three-stage system of public schooling to replace the old two-stage system. Secondly, it was designed to relieve the overcrowding at Overbrook caused by the influx of Concord students for the seventh and eighth grades. Thirdly, the Board of Education was moving to improve racial balance as required by an order of the Pennsylvania Human Relations Commission, promulgated under the Pennsylvania Human Relations Act, Act of Oct. 27, 1955, P. L. 744, *as amended,* 43 P.S. §951 et seq. Knoxville was predominantly a black school, while most, if not all, of the Concord students assigned to Knoxville were white.

All of these were clearly proper considerations in student assignments.

Even if the facts are construed most unfavorably against the defendant Board of Education, it could only be said that there was a failure to maintain adequate discipline at Knoxville, admittedly an unfortunate situation, but not one which necessitates injunctive relief of the type sought here. Moreover, not only has there been no showing that the Board acted in bad faith, but in fact, it is clear that the reorganization plan was a carefully planned and well-intended project.

In considering the preliminary injunction in this case, our Supreme Court further pointed out that "[i]n the absence of clear evidence indicating that the students who testified were singled out for abuse because they came from Concord or evidence that similar attacks against other Concord students could be anticipated, the sweeping injunction requiring the reassignment of all Concord area students was unwarranted." *Zebra, supra,* 449 Pa. at 439, 296 A. 2d at 751. Not only was there no testimony which would satisfy these proof requirements, but there was no showing that the unpleasant incidents which did occur were directly related to the implementation of the reorganization plan. In fact, there was evidence that some Concord area students did remain at Knoxville without experiencing any of the difficulties encountered by the plaintiffs' witnesses.

We should re-emphasize the assertion by the Supreme Court that "a parent is justified in withdrawing his child from a school where the health and welfare of the child is threatened." *Zebra, supra,* 449 Pa. at 438, 296 A. 2d at 751. Section 1310 of The Public School Code of 1949, Act of March 10, 1949, P. L. 30, *as amended,* 24 P.S. §13-1310, authorizes the board of school directors of every school district to subdivide the district and assign students to appropriate schools.

The statute also provides in part as follows: "The board of school directors may, upon cause shown, permit any pupil or pupils in any school district to attend such other school in the district as the board may deem proper, or may classify and assign the pupils in the district to any school or schools therein as it may deem best, in order to properly educate them." Section 1310 of The Public School Code of 1949, Act of March 10, 1949, P. L. 30, *as amended*, 24 P.S. §13-1310. Certainly if a child's health and safety were so seriously endangered that he or she could not receive a proper education, the child's parents should seek reassignment under this statute. An injunction against enforcement of the whole reorganization plan, however, is not an appropriate means for effecting whatever individual reassignments may be justified.

The final decree of the Court of Common Pleas of Allegheny County is, therefore, reversed and the injunction appealed from is vacated.