581 A.2d 916

**CITY OF PHILADELPHIA, W. Wilson Goode, Mayor of the City of Philadelphia, Carlo R. Gambetta, Finance Director of the City of Philadelphia, Eric Pookrum, Treasurer of the City of Philadelphia, James Stanley White, Managing Director of the City of Philadelphia, Orville W. Jones, Personnel Director of the City of Philadelphia, Councilman Joseph E. Coleman, President of the City Council, Councilman David Cohen, Councilman Francis Rafferty, Councilman Leland Beloff,**

Councilman Lucien E. Blackwell, Councilman John F. Street, Councilman Brian F. O'Neill, Councilwoman Ann J. Land, Councilwoman Patricia Hughes, Councilwoman Joan L. Krajewski, Councilwoman Augusta A. Clark, Councilwoman Ann C. Verna, Philadelphia Board of Pensions & Retirement, Anthony Witlin, Executive Director, Philadelphia Board of Pensions & Retirement, and Joseph C. Vignola, City Controller of the City of Philadelphia, Appellants,

v.

DISTRICT COUNCIL 33, AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL–CIO, and Earl Stout, as Trustee Ad Litem and President of District Council 33, AFSCME, AFL–CIO, Appellees.

Supreme Court of Pennsylvania.

Argued Oct. 24, 1989.

Decided Oct. 5, 1990.

470

Ralph J. Teti, Philadelphia, for appellants.

Deborah Willig and Alaine S. Williams, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## ORDER OF COURT

PER CURIAM.

The Court being equally divided, the judgment of the Commonwealth Court is affirmed.

LARSEN, J., files an opinion in support of affirmance joined by ZAPPALA and PAPADAKOS, JJ.

NIX, C.J., files an opinion in support of reversal joined by FLAHERTY and McDERMOTT, JJ.

## OPINION IN SUPPORT OF AFFIRMANCE

LARSEN, Justice.

This is an appeal from an *en banc* order of the Commonwealth Court affirming the grant of a preliminary injunction by the Court of Common Pleas of Philadelphia County. Appellees District Council 33 of AFSCME, et al. (Union), instituted the underlying action seeking to enjoin appellants City of Philadelphia, et al. (City), from enforcing Philadelphia Ordinance 1107, which would have put Municipal Retirement System Benefit Plan 1987 into effect. That plan, commonly known as Plan 1987, differed significantly and adversely from the benefit plan contained in the collective bargaining agreement then in effect between the parties. The issues raised by this appeal are (1) whether the Court of Common Pleas had subject matter jurisdiction over this action; and (2) whether the Union was entitled to preliminary injunctive relief enjoining the City from enforcing Philadelphia Ordinance 1107 as it pertains to the Union.

On July 22, 1986, the parties agreed to continue in effect, until June 30, 1988, the provisions of their previous collective bargaining agreement, including the pension and retirement benefit provisions referred to as Plan J. In December of 1984, the legislature had enacted the Municipal Pension

Plan Funding Standard and Recovery Act[1] (Act 205), which establishes procedures whereby, among other things, municipalities with financially distressed pension plans could avail themselves of the Act's special relief provisions. Depending on the municipality's degree of financial distress, as determined by the Public Employee Retirement Study Commission (Commission), a municipality could elect to participate in one of the program's three levels of recovery. A municipality's participation in the program affords the municipality financial and other benefits, while imposing obligations on new municipal employees designed to restore actuarial health to the ailing pension plan.

The Commission evaluated the financial condition of the City's pension plan and determined that the City's plan was "severely distressed." This being the worst rating, the Commission found that the City was entitled to participate in Level III of the recovery program. The City then elected to participate in the program at that level.

One of the mandatory remedies required of Level III participants is:

> The establishment of a revised benefit plan for newly hired municipal employees.... The revised benefit plan shall have a normal cost which is less than the normal cost of the benefit plan applicable to current municipal employees as reported in the most recent prior actuarial valuation report of the pension plan.

53 P.S. § 895.606(b)(2). Act 205 also provides that, "[n]otwithstanding any provision of law, municipal charter, municipal ordinance, municipal resolution, or pension plan agreement, document or instrument to the contrary, the remedies specified in this section shall be available to the applicable municipalities." 53 P.S. § 895.607(a).

Philadelphia Ordinance 1107, passed on January 8, 1987, was designed to comply with the Act 205 requirement of establishing a revised benefit plan. The ordinance contained new benefit provisions, known as Plan 87, which

1. Act of December 18, 1984, P.L. 1005, *as amended*, §§ 101–803, 53 P.S. §§ 895.101–895.803.

differed significantly from the Plan J provisions then currently in effect. Plan 87 changed the eligibility requirements making it more difficult to be eligible for benefits, altered the benefit calculation formula so as to reduce benefits and eliminated service-connected disability benefits for newly hired employees.

On January 14, 1987, the Union filed its complaint in equity claiming that the City, through Ordinance 1107, had unilaterally abrogated the pension provisions of the collective bargaining agreement and impaired the obligations of the contract in violation of the Pennsylvania and United States constitutions. The Union sought injunctive and declaratory relief. That same day, the Union filed a motion for preliminary injunction.

After a hearing, the Court of Common Pleas of Philadelphia County issued an order on March 6, 1987 that (1) preliminarily enjoined the City from enforcing Ordinance 1107, as it pertained to the Union, until the expiration of the collective bargaining agreement, (2) maintained jurisdiction over the matter through June 30, 1988 or until a full hearing on the permanent injunction or other resolution, (3) stated that the injunction might be dissolved upon the City's showing that enforcement of the injunction would be more harmful than beneficial, and (4) required that the Union post a $15,000 bond. The City appealed, and the Commonwealth Court, sitting *en banc*, affirmed on December 18, 1987.

■ The City first asserts that the Court of Common Pleas did not have jurisdiction over this matter. The City characterizes this case as a labor dispute and claims that, as such, the Pennsylvania Labor Relations Board (PLRB) has exclusive jurisdiction over the matter. The Public Employe Relations Act (PERA) provides:

The [PLRB] is empowered, as hereinafter provided, to prevent any person from engaging in any unfair practice listed in Article XII of this act. This power shall be exclusive and shall not be affected by any other means of

adjustment or prevention that have been or may be established by agreement, law, or otherwise.

43 P.S. § 1101.1301. In accordance with this, this Court has developed a policy of judicial deference where unfair labor practices are involved and has stated that:

> [I]f a party directly seeks redress of conduct which arguably constitutes one of the unfair labor practices listed in Article XII (Section 1201) of the PERA, 43 P.S. § 1101.1201 (Supp.1976), jurisdiction to determine whether an unfair labor practice has indeed occurred and, if so, to prevent a party from continuing the practice is in the PLRB, and nowhere else.

*Hollinger v. Department of Public Welfare,* 469 Pa. 358, 366, 365 A.2d 1245, 1249 (1976).

Among the unfair labor practices listed in Article XII of the PERA is the refusal to "bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit." 43 P.S. § 1101.1201(a)(5). The City claims that the subject matter of the Union's complaint involves a labor dispute over the City's failure to bargain with the Union about the new pension system, and therefore, the PLRB has exclusive jurisdiction. The Union, on the other hand, maintains that the complaint does not assert unfair labor practices, but rather it asserts a breach of contract and an unconstitutional impairment of the contract and is thus properly before the Court of Common Pleas.

One need only look at the complaint itself to see that the underlying case sounds in contract. In its complaint, the Union raises two contract issues—whether the City's enforcement of Philadelphia Ordinance 1107 breached the contract and whether that same enforcement violated the protections against laws impairing contracts contained in the Pennsylvania Constitution [2] and the United States Con-

---

**2.** "No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." Pa. Const. art. I, § 17.

stitution.[3] Neither issue addresses a failure to bargain, as the City alleges. Moreover, the complaint did not seek relief that would force the City to bargain over the new pension plan. Instead, the complaint sought to enjoin the City from enforcing Ordinance 1107 and to declare the enforcement of the ordinance both a breach of the collective bargaining agreement and an unconstitutional impairment of their contract.

This Court, in *Hollinger, supra,* held the PLRB's exclusive jurisdiction over unfair labor practice cases "does not, of course, divest a court of jurisdiction to entertain suits for *breach of contract* merely because the alleged breach may arguably be an unfair labor practice." 469 Pa. at 365 n. 10, 365 A.2d at 1249 n. 10 (emphasis in the original). As noted above, the complaint clearly alleges a breach of contract, and as such, the Court of Common Pleas had proper jurisdiction over this matter.

The City's second issue on appeal is whether the Union was entitled to preliminary injunctive relief enjoining the City from enforcing Philadelphia Ordinance 1107 as it pertains to the Union. The City claims that the Union has not met all of the requirements for a preliminary injunction. The prerequisites for a preliminary injunction, as established by this Court, are:

> [F]irst, that it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct. (citation omitted). Even more essential, however, is the determination that the activity sought to be restrained is actionable, and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will not generally be awarded: *Keystone Guild, Inc. v.*

3. "N₀ state shall ... pass any ... law impairing the obligation of contracts." U.S. Const. art. I, § 10.

*Pappas*, 399 Pa. 46, 159 A.2d 681 (1960), and *Herman v. Dixon*, 393 Pa. 33, 141 A.2d 576 (1958).

*Singzon v. Department of Public Welfare*, 496 Pa. 8, 436 A.2d 125 (1981).

█ Where a preliminary injunction is merely prohibitory, as it is here, appellate courts will not review the merits of the controversy but will determine if there were any "apparently reasonable grounds" to support the lower court's action and will reverse only if no such grounds exist. *Mazzie v. Commonwealth*, 495 Pa. 128, 432 A.2d 985 (1981).

█ The City first argues that the Union failed to demonstrate that it was likely to succeed on the merits. The City contends that its unilateral decision to enact the new pension plan for newly hired employees did not, as the Union asserts, constitute a breach of contract or impair the constitutional right to contract. This contention must be rejected.

This Court's decision in *City of Allentown v. Local 302, International Association of Fire Fighters, et al.*, 511 Pa. 275, 512 A.2d 1175 (1986) establishes the Union's clear right to relief. That case involved a suit brought by fire fighters challenging the validity of an ordinance pursuant to which all fire fighters hired after a certain date were ineligible for membership in the City of Allentown's pension fund and were required to participate in a plan established by the Pennsylvania Municipal Retirement Law of 1974.[4] The fire fighters argued that the new plan was contrary to the collective bargaining agreement then in effect between the parties. In *City of Allentown*, we held that the "unilateral decision by the City to initiate new pension terms for some members of the bargaining unit constituted a breach of the collective bargaining agreement." *Id.*, 511 Pa. at 287, 512 A.2d at 1181. "Once the matter is included in a collective bargaining agreement, it becomes, like any other contractual provision, binding on the parties to the agreement." *Id.* If we were to allow provisions of a collective bargaining

4. 53 P.S. §§ 881.101–881.501.

agreement to be unilaterally altered, we would effectively render the collective bargaining process a nullity.

The City asserts that both the trial court and the Commonwealth Court incorrectly relied on *City of Allentown* as controlling and dispositive of this issue because that case did not involve, as herein, an Ordinance enacted for the economic promotion of the Commonwealth. The City points out that the legislature passed Act 205 to prevent the impending funding crises of municipal government retirement systems. However, this Court has also held that unilateral, governmental action breaching employees' contractual rights is an unconstitutional impairment of contract, despite having as its purpose the economic enhancement of the Commonwealth. *Association of Pennsylvania State College and University Faculties, et al., v. State System of Higher Education, et al.,* 505 Pa. 369, 479 A.2d 962 (1984).

The City also suggests that *City of Allentown* is distinguishable because in that case the City of Allentown elected to revise its benefit plan and in the case herein Act 205 forced the City to do so by "requir[ing] a municipality seeking assistance to take certain steps," which include instituting a revised benefit plan (Appellants' Brief at p. 10). The City misstates the facts. The City herein *chose* to participate in the Act 205 recovery program and was not statutorily compelled to do so, just as the City of Allentown chose to change its benefit plan. Furthermore, the City chose to participate specifically at Level III of the program and not at either of the two other levels that do not require a revised benefit plan. Therefore, *City of Allentown* is not distinguishable but instead is controlling here. Applying the holding of *City of Allentown* to the facts of the instant case, it is clear that "apparently reasonable grounds" exist to support the trial court's action.

The City next argues that the Union failed to show that it would suffer immediate or irreparable harm as a result of the City's enforcement of Philadelphia Ordinance 1107. Testimony offered at the hearing revealed that enforcement

of Plan 87 would result in an immediate diminution of benefits to members of the Union compared to the benefits provided under the existing Plan J (H.T., 1/30/86, pp. 13–18). Based on this, the trial court inferred that the Union would sustain a permanent membership loss resulting from the City's unilateral diminution of benefits. The trial court further inferred that the loss would be both immediate and irreparable because neither current nor future union members would have any use for a union powerless to enforce its current collective bargaining agreement. Given the evidence presented at the hearing and the trial court's reasonable inferences, there are "apparently reasonable grounds" for the trial court's conclusion that the Union would sustain immediate and irreparable harm as a result of the City's enforcement of Philadelphia Ordinance 1107.

 Finally, the City argues that the public interest would be adversely affected by an injunction. Among the factors that a court must weigh in deciding whether or not to grant a preliminary injunction is the effect such a preliminary injunction would have on the public interest. *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 501–502, 426 A.2d 1123, 1129 (1981); *McMullan v. Wohlgemuth,* 444 Pa. 563, 572–573, 281 A.2d 836, 841 (1971).

The City relies on *Leonard v. Thornburgh,* 75 Pa. Cmwlth.Ct. 553, 463 A.2d 77 (1983), where the Commonwealth Court addressed a taxpayer's action to enjoin the City of Philadelphia from collecting its wage tax at different rates for residents and non-residents. In *Leonard,* the Commonwealth Court found that the taxpayer was likely to succeed on the merits but denied the preliminary injunction nonetheless. The court held that the enjoining of the collection of the wage tax would create a $60 million deficit and propel the City of Philadelphia into a "state of fiscal paralysis." *Id.,* 75 Pa.Cmwlth.Ct. at 564, 463 A.2d at 82.

In the instant case, the City alleges that participation in the Act 205 recovery program would require the City to change its actuarial funding standard to include a "level

dollar amortization payment schedule." Such a change would increase the City's mandatory contribution to the pension system from $95 million, the amount currently appropriated, to $177 million. Additionally, the City contends that because of the injunction it would not be eligible to receive between $27 million and $30 million in supplemental state assistance available to Level III participants. In effect, the City alleges that the public interest would be adversely affected because the City would be required to expend an additional $82 million and forego receiving substantial supplemental state assistance.

In point of fact, Act 205 provides for delayed implementation of the mandatory funding standard, and as such, the City would not have to expend the additional $82 million. *See* 53 P.S. §§ 895.606(a)(4), 895.607(g) and 895.607(h). As for the loss of supplemental state assistance, the trial court held that the City did not offer any evidence that it would be barred from participating in the recovery program and lose money if the preliminary injunction were granted. Moreover, the preliminary injunction issued by the trial court retained jurisdiction over the matter and stated that the injunction might be dissolved upon a showing by the City that enforcement of the injunction would be more harmful than beneficial. The City has made no such showing. Therefore based on the above, there are "apparently reasonable grounds" to support the trial court's determination that the public interest would not be adversely affected by a preliminary injunction.

Accordingly, we affirm the decision of the Commonwealth Court, which affirmed the decision of the Court of Common Pleas granting appellees' request for a preliminary injunction.

## OPINION IN SUPPORT OF REVERSAL

NIX, Chief Justice.

The City of Philadelphia ("City") appeals an *en banc* Commonwealth Court order which affirmed the grant of a

preliminary injunction by the Court of Common Pleas of Philadelphia County. District Council 33 of the American Federation of State, County and Municipal Employees, AFL–CIO ("Union") had sought the injunction to prevent the implementation of City Ordinance 1107 which enacted Municipal Retirement System Benefit Plan 1987 ("Plan 87"). The Ordinance was enacted pursuant to the Municipal Pension Plan Funding Standard & Recovery Act, 53 P.S. § 895.101, *et seq.* ("Act 205"). Act 205 provides mechanisms for assisting municipal pension funds in financial distress. The City qualified, under Act 205, as Distress Level III, the highest degree of distress, and followed the procedures outlined in section 607(e) of the Act intended to ameliorate the financial distress.

## I.

Act 205 came into existence by legislative enactment December 18, 1984. It sought a strengthening of municipal pension plans by requiring actuarially-based current funding standards and by establishing state-aided, voluntary remedial rules to aid seriously underfunded pension plans in achieving compliance with the standards.

In January, 1985 the City consulted with representatives of the Fraternal Order of Police, District Council 47 of American Federation of State, County and Municipal Employes ("AFSCME"), International Association of Firefighters and District Council 33 of AFSCME regarding a review of the City's existing pension system ("Plan J") and a consideration of a revised benefit plan for newly hired City employees. On August 15, 1985, the Pennsylvania Public Employee Retirement Study Commission wrote the City its pension system qualified as a financially distressed system at Level III. City Council elected to participate at Recovery Program Level III. On December 31, 1985, the Commission certified the City's authorization to participate in Level III of Act 205. Subsequently, and in spite of its election to participate and its acceptance in Act 205's Recovery Program, the City, in July 1986, entered into a contract entitled

"Memorandum of Understanding" with the Union which again committed the parties to pension Plan J[1] from July 1, 1986, through June 30, 1988. All persons represented by the Union and hired during the term of the contract were entitled to benefits under Plan J.

Nonetheless, in October, 1986 the Mayor caused to be introduced into City Council an ordinance seeking to establish a revised benefit system for newly hired employees. City Council introduced and passed its own Ordinance 1107 over the Mayor's veto. Ordinance 1107 created Plan 87.

On January 14, 1987, the Union, by complaint in equity, sought 1) a preliminary and permanent injunction from the court of common pleas restraining the City from implementing Ordinance 1107, and 2) a declaration that the Ordinance is a breach of the collective bargaining agreement between the Union and the City and violates Article I, § 17 of the Pennsylvania Constitution and Article 1, § 10, clause 1 of the Constitution of the United States prohibiting the impairment of contracts. The preliminary injunction was granted and the City appealed. The Commonwealth Court affirmed.

## II.

At the outset the City raises a question of jurisdiction of the common pleas court. Arguing the subject matter of the case is a labor dispute between the City and the Union, the City contends jurisdiction lies exclusively with the Pennsylvania Labor Relations Board. This position is based upon a characterization of the controversy as a labor dispute, reference to sections 1101.1201(a) and 1101.1301 of the Public Employee Relations Act,[2] 43 Pa.C.S. § 1101.101, *et seq.*,

---

1. Plan J had been in effect since 1968 as a result of collective bargaining. Differences between Plan J and Plan 87 were, *inter alia,* increased eligibility requirements, changes in the benefit calculation formula resulting in a reduction of benefits and the elimination of service connected disability benefits.

2. § 1101.1201. Unfair practices by public employers; acts prohibited

("PERA"), and case law, *citing* to *Hollinger v. Department of Public Welfare*, 469 Pa. 358, 365 A.2d 1245 (1976).

The Union disputes this charge and asserts the gravamen of the controversy is breach of contract with constitutional violations. Unquestionably the underlying case sounds in contract. The enactment of Ordinance 1107 with its pension Plan 87 in the face of a recently bargained contract continuing the effectiveness of pension Plan J clearly gives rise to a single issue: was the passage of Ordinance 1107, pursuant to Act 205, a constitutionally prohibited impairment of the obligation of contract then existing between the Union and the City.

Manifestly, the court of common pleas has subject matter jurisdiction over this constitutional contract issue. The City's argument that jurisdiction lies exclusively with the PLRB collapses totally when the sole issue raised by the controversy is recalled, for the PLRB does not have jurisdiction to determine constitutional issues. *See*, 43 P.S. § 1101.101, *et seq.*

Additionally, although the alleged breach of contract might conceivably be deemed an unfair labor practice, if the Union's constitutional arguments were to be upheld, such would not oust the jurisdiction of the court of common pleas. *Hollinger v. Department of Public Welfare, supra,* contrair to the urgings of the City, said

> (a) Public employers, their agents or representatives are prohibited from:
>
> \* \* \* \* \* \*
>
> (5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.
>
> \* \* \* \* \* \*
>
> (9) Refusing to comply with the requirements of "meet and discuss."
>
> § 1101.1301. Exclusive power in board to prevent unfair practices
>
> The board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair practice listed in Article XII of the act. This power shall be exclusive and shall not be affected by any other means of adjustment or prevention that have been or may be established by agreement, law, or otherwise.

[Exclusive power in the Pennsylvania Labor Relations Board to prevent unfair labor practices] does not, of course, divest a court of jurisdiction to entertain suits for *breach of contract* merely because the alleged breach may arguably be an unfair labor practice. (Citations omitted.) (Emphasis in original.)

469 Pa. at 365, n. 10, 365 A.2d at 1249, n. 10.

We therefore hold that jurisdiction over the subject matter raised by this case is in the court of common pleas.

The standard of review on appeal from the grant or denial of a preliminary injunction is firmly established. As early as 1884, in *Paxson's Appeal,* 106 Pa. 429, 437, this Court stated: "In cases of appeal from a decree refusing, or granting, a preliminary injunction, the general rule is to express no opinion upon the merits of the case, but merely say whether we think the discretion of the court was rightly exercised: Hoffman's Appeal, 10 W.N.C., 401." By 1909, the standard had been refined to the following: "On an appeal from a decree awarding or refusing a preliminary injunction we do not consider the merits of the case except to determine whether there was reasonable ground for the action of the court." *Delaware and Hudson Company v. Olyphant Borough,* 224 Pa. 387, 389, 73 A. 458 (1909). The precursor of our present standards opened a window on that narrow standard by applying "apparently reasonable grounds" and was enunciated by Mr. Justice von Moschzisker, later Chief Justice, in *Sunbury Borough v. Sunbury and S.R. Co.,* 241 Pa. 357, 359, 88 A. 543 (1913):

Our uniform rule is that upon an appeal from a decree which refuses, grants or continues a preliminary injunction, we will only look to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied upon are palpably wrong or clearly inapplicable.... (Citations omitted.)

One recent standard of review contains broad criteria for determining whether or not there were "apparently reasonable grounds" and is stated:

As a preliminary consideration, we recognize that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the Chancellor. *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (filed April 17, 1975); *Credit Alliance Corp. v. Philadelphia Minit–Man Car Wash Corp.*, 450 Pa. 367, 301 A.2d 816 (1973); *Zebra v. Pittsburgh School District*, 449 Pa. 432, 296 A.2d 748 (1972). "In order to sustain a preliminary injunction, the plaintiff's right to relief must be clear, the need for relief must be immediate, and the injury must be irreparable if the injunction is not granted." *Zebra v. Pittsburgh School District*, 449 Pa. at 437, 296 A.2d at 750.

*Roberts v. School District of Scranton*, 462 Pa. 464, 469, 341 A.2d 475, 478 (1975).

This language has been quoted approvingly in *Willman v. Children's Hospital of Pittsburgh*, 505 Pa. 263, 479 A.2d 452 (1984); *Ezy Parks v. Larson*, 499 Pa. 615, 454 A.2d 928 (1982); *Shenango Valley Osteopathic Hospital v. Department of Health*, 499 Pa. 39, 451 A.2d 434 (1982); *Singzon v. Department of Public Welfare*, 496 Pa. 8, 436 A.2d 125 (1981).

Another current explication contains an even broader gauge when examining the "apparently reasonable grounds" aspect of the scope of review, introduces the term "essential prerequisites," and has been set forth as follows:

The scope of our review on an appeal from a decree either granting or denying a preliminary injunction is "to examine the record only to determine 'if there were any

*apparently reasonable grounds* for the action of the court below. . . .' *Lindenfelser v. Lindenfelser,* 385 Pa. 342, 343–55, 123 A.2d 626, 627 (1956). (Emphasis supplied). *Summit Township v. Fennell,* 392 Pa. 313, 140 A.2d 789 (1958)." *Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp.,* 410 Pa. 214, 215, 189 A.2d 180, 181 (1963). And the essential prerequisites for the issuance of a preliminary injunction are: first, that it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct. *Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp., supra.* Even more essential, however, is the determination that the activity sought to be restrained is actionable, and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will not generally be awarded: *Keystone Guild, Inc. v. Pappas,* 399 Pa. 46, 159 A.2d 681 (1960), and *Herman v. Dixon,* 393 Pa. 33, 141 A.2d 576 (1958).

*Albee Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 181, 207 A.2d 768 (1965).

The "essential prerequisites" of *Albee* have been quoted in *Singzon v. Commonwealth, Department of Public Welfare, supra; Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 501, 426 A.2d 1123, 1128–1129 (1981); *Commonwealth v. Coward,* 489 Pa. 327, 340, 414 A.2d 91, 98 (1980); *New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978); *Bryant Co. v. Sling Testing and Repair,* 471 Pa. 1, 6, 369 A.2d 1164, 1166 (1977); *Commonwealth v. Graver,* 461 Pa. 131, 135, 334 A.2d 667, 669 (1976); *Credit Alliance Corporation v. Philadelphia Minit–Man Car Wash Corporation,* 450 Pa. 367, 371, 301 A.2d 816, 818 (1973).

Further, an additional factor, applied when relevant, in seeking "apparently reasonable grounds" is the possibility of an adverse effect upon the public. *Valley Forge Historical Society v. Washington Memorial Chapel, supra; McMullan v. Wohlgemuth,* 444 Pa. 563, 572, 281 A.2d 836, 841 (1971).

The Union argues it had a clear right to prevail on the ground that the unilateral decision by the City to initiate new pension terms for those employed after January 1, 1987, constituted a breach of contract that is prohibited by Article 1, § 17 of the Pennsylvania Constitution [3] and Article 1, § 10 of the United States Constitution.[4] This contention must be rejected.

We must be mindful that "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." *Home Building and Loan Association v. Blaisdell,* 290 U.S. 398, 428, 54 S.Ct. 231, 236, 78 L.Ed. 413 (1934). The state [5] possesses authority to safeguard the vital interests of its people. *Id.* at 434, 54 S.Ct. at 238. *Home Building and Loan* reemphasized, quoting from *Manigault v. Springs,* 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905), that

> [i]t is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise

---

3. "No ... law impairing the obligation of contract ... shall be passed." Pa. Const. art. I, § 17.

4. "No state shall ... pass any ... law impairing the obligation of contracts." U.S. Const. art. I, § 10.

5. A municipal ordinance enacted, pursuant to power delegated by the legislature of the state, is a state law within the meaning of the impairment clause of the Federal Constitution. *Atlantic Coast Line v. Goldsboro,* 232 U.S. 548, 555, 34 S.Ct. 364, 366–367, 58 L.Ed. 721 (1914).

of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. *Id.* at 437, 54 S.Ct. at 240.

*Home Building and Loan* made it quite clear that
[n]ot only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' *Stephenson v. Binford*, 287 U.S. 251, 276, 53 S.Ct. 181, 189, 77 L.Ed. 288. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. *Id.* 290 U.S. at 434, 435, 54 S.Ct. at 238, 239.

The economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts. *Id.* at 437, 54 S.Ct. at 239–240.

Pennsylvania has long recognized these principles. In *DePaul v. Kauffman*, 441 Pa. 386, 272 A.2d 500 (1971) (upholding the constitutionality of the Pennsylvania Rent Withholding Act, 35 Pa. C.S. § 1700–1, *et seq.*), we relied upon the holdings of *Home Building and Loan* and *Zenger Milk Co. v. Pittsburgh School District*, 334 Pa. 277, 5 A.2d 885 (1939).

With regard to leases that predate the effective date of the Act, it must be borne in mind that " 'the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as ... are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.' " *Home Bldg. and Loan Ass'n. v. Blaisdell*, 290 U.S. 398, 437, 54 S.Ct. 231, 240 [78 L.Ed. 413] (1934). This Court has itself recognized that " '[t]he

constitutional protection of the obligation of contracts is necessarily subject to the police power of the state, and therefore a statute passed in the legitimate exercise of the police power will be upheld by the courts, although it incidentally destroys existing contract rights....' " *Zenger Milk Co. v. Pittsburgh School District*, 334 Pa. 277, 280, 334 Pa. 277, 5 A.2d 885, 886 (1939) (sustaining minimum price regulation modifying price term of existing contract).

441 Pa. at 398, 399, 272 A.2d at 506, 507.

*Accord, Shapp v. Sloan*, 480 Pa. 449, 473, 391 A.2d 595, 606–607 (1978) (Opinion by Justice Manderino, two Justices concurring and one Justice concurring in the result). *See also, Cianfrani v. Commonwealth, State Employees Retirement Board*, 57 Pa.Commw. 143, 426 A.2d 1260 (1981), affirmed 501 Pa. 189, 460 A.2d 753 (1983) (statutes passed for the general good of the public are constitutional even if the statute incidentally alters existing contract rights).

With the above principles in mind, we examine the factual situation here and find the action taken as directed by Ordinance 1107 enacted pursuant to Act 205 is part of an effort to effectuate a recovery program for municipal pension systems determined to be financially distressed. Such a purpose is clearly for the promotion of the common weal, the general good of the public, and is an exercise of the sovereign right of the government to protect lives, health, comfort and general welfare of the people.

The Federal government had passed the Employee Retirement Income Security Act of 1974 ("ERISA") affecting private employee pension plans because, *inter alia,* despite enormous growth in employee benefit (including pension) plans, many employees with long years of employment were losing anticipated retirement benefits owing to the lack of vesting provisions and to the inadequacy of current minimum standards which endangered the soundness and stability of such plans with respect to adequate funds to pay promised benefits. Congress found that the continued se-

curity of millions of employees and their dependents was directly affected by these plans. *See* 29 U.S.C.A. § 1001.

ERISA did not cover governmental employee benefit plans including such plans established and maintained by the government of any state or political subdivision thereof. 29 U.S.C.A. § 1003, 1002(32). It was hoped the states would address the issue themselves.

After finding "serious and growing unfunded liabilities in local government pension funds" and "[p]ublic employee retirement policy is of vital concern to both the executive and legislative branches of state government", Pennsylvania's response to the issue was to pass the "Public Employee Retirement Study Commission Act", 43 P.S. § 1401, *et seq.*, in 1981. The Commission was charged with formulating and recommending the passage of legislation that would mandate actuarial funding standards and would establish a recovery program for municipal pension systems determined to be financially distressed. The report of the Commission revealed the approximately 2,300 local government retirement systems in the Commonwealth had a combined unfunded liability of approximately $3,000,000,000.00 and, unless extensive intervention by the Commonwealth was forthcoming, funding crises for municipal government retirement systems were inevitable. Specifically, in the City of Philadelphia, as of July 1, 1985, the unfunded liability of the Philadelphia Board of Pensions was $1,731,000,000.00. The City has been amortizing the liability by paying a percent higher than the payment made the previous year. This process is spread over a thirty-year period begun in 1979 and ending in 2019. In 1986 the City paid $95,000,-000.00 towards the unfunded liability. If the City does not receive special relief under Act 205, by complying with its mandatory provisions, the Act requires "level dollar amortization payments" which in the case of 1986 would amount to $177,000,000, a difference of $82,000,000.

Clearly the Ordinance and pension Plan 87 were integral parts of a state plan enacted for the health and welfare of its citizens by adjusting the burdens and benefits of their

economic life. The alteration or modification of the contract between the Union and the City, reached with full knowledge by both parties of the City's efforts to participate in the Retirement Recovery Program is appropriate. The complaint of unconstitutional impairment of the obligation of the existing contract is without merit.

The Union argues its right is clear, relying exclusively upon the second holding in *City of Allentown v. Local 302, International Association of Fire Fighters, et al.*, 511 Pa. 275, 512 A.2d 1175 (1986). That case involved an interpretation of the language of the Pennsylvania Municipal Retirement Law of 1974 ("1974 Act"), 53 P.S. § 881.101–881.501, which established a Municipal Retirement System for the payment of retirement allowances to officers, employees, firemen and police of political subdivisions and municipal authorities and of institutions supported and maintained by political subdivisions and municipal government associations. In *City of Allentown* we held that 1) the Municipal Retirement Law permits a municipality to require enrollment of one group of police or firemen in the Retirement system, while leaving for vote of the members of another group—those enrolled in an existing pension fund—the decision whether or not to join the Retirement System, and 2) the unilateral decision by the City to initiate new pension terms for some members of the bargaining unit constituted a breach of the collective bargaining agreement. *Id.*, 511 Pa. at 286, 287, 512 A.2d 1175.

However, the Union's reliance upon that case is misplaced. First, the holding in *City of Allentown*, that the unilateral decision by the City to initiate new pension terms for some members of the bargaining unit constituted a breach of the collective bargaining agreement, did not involve an Ordinance enacted pursuant to an act passed for the promotion of the economic well-being of the Commonwealth as was Act 205. The 1974 Act was a part of a legislative attempt to participate in and gain some control of the public employee pension plans proliferating in Pennsylvania. The attempt included passage, within two years,

of three independent state-wide pension systems. *See* the "Pennsylvania Municipal Retirement Law," Act of February 1, 1974 (P.L. 34, No. 15), 53 Pa.C.S. § 881.101, *et seq.;* the "State Employees Retirement Code", Act of March 1, 1974 (P.L. 125, No. 31), 71 Pa.C.S. § 5101, *et seq.;* and the "Public School Employees Retirement Code", Act of October 2, 1975 (P.L. 298, No. 96), 24 Pa.C.S. § 8101, *et seq.* As the City points out, these three employee retirement systems were not intended to address the subsequently revealed critical need for *all* local government employee retirement systems throughout the Commonwealth to be maintained on an actuarially sound basis and for the establishment of a program to assist financially distressed pension systems as did Act 205.[6]

**6.** The Opinion In Support Of Affirmance states without support therefor "[T]his Court has also held that unilateral, governmental action breaching employees' contractual rights is an unconstitutional impairment of contract—*despite having as its purpose the economic enhancement of the Commonwealth.*" Slip op. at 9 (emphasis added). The case cited to support that statement, *Association of Pennsylvania State College and University Faculties, et al., v. State System of Higher Education, et al.,* 505 Pa. 369, 479 A.2d 962 (1984), addressed the question of unilateral governmental impairment of government employees' contractual rights where the *purpose* of the governmental action (a statutory amendment to the State Employees Retirement Code) was to maintain actuarial soundness of the Pension Fund. 505 Pa. at 372, 479 A.2d at 963. Maintenance of actuarial soundness of a single governmental pension fund may not be paraphrased as "the economic enhancement of the Commonwealth" with any regard for accuracy or validity.

While *APSCUF v. State System* examined an amendment passed to *maintain* actuarial soundness in one government employee retirement system, the case *sub judice* scrutinizes the constitutionality of an act the purpose of which is the promotion of the common weal by 1) mandating actuarial soundness in all municipal retirement systems (when 2,300 such systems in the state had a combined unfunded liability of approximately Three Billion Dollars), and 2) providing financial assistance to those municipal employee retirement systems where the municipality chooses to seek aid and it is determined there is a Distress Level under the recovery program. The citation to *APSCUF v. State System of Higher Education* is clearly of no moment; hence, it must be acknowledged this Court has not held unilateral governmental action which impaired a contract to be unconstitutional where the purpose of the governmental action was the economic well-being of the Commonwealth, a form of the general good of the public or a promotion of the common weal.

Second, there was no language in the 1974 Act to support a finding the legislature intended to employ "the implicit power reserved by the public employer to unilaterally alter a bargained for provision in the contract...." 511 Pa. at 288, 512 A.2d at 1177. On the other hand, Act 205 makes mandatory, for any municipality to which Distress Level III of the recovery program applies, the establishment of a revised benefit plan for newly hired municipal employees pursuant to section 607(e). Section 607(e) directs that "[a] revised benefit plan for newly hired municipal employees shall be developed *with consultation with representatives of the collective bargaining unit* applicable to the affected type of municipal employee...." (Emphasis supplied.) The fact that the legislature was not silent on the matter but employed the terms "with consultation" rather than "through collective bargaining" indicates the General Assembly intended to employ the sovereign power of the public employer to unilaterally alter a bargained for provision of an existing contract.[7] Thus, *City of Allentown v.*

Further, in no instance has this Court ignored the rules of law expressed by the United States Supreme Court in cases such as *Home Building and Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (which held the prohibition against impairment of the obligation of contract was not absolute), when scrutinizing governmental action for impairment of contract alleged to violate the federal constitution. Yet the opposite conclusion becomes inescapable if one accepts the above statement quoted from the Opinion In Support Of Affirmance.

7. The Opinion In Support of Affirmance completely misperceives the relevance of the mandatory aspect of certain sections of Act 205 in this analysis. The second distinction between City of Allentown and the case *sub judice* set forth in this opinion, devolves from the enunciated legislative intent to use its power to unilaterally alter a bargained contract, which did not exist in City of Allentown. Here, once the municipality elects to seek revenue aid under Act 205 and is determined to be Distress Level III, the municipality is mandated to utilize three remedies, one of which is the "establishment of a revised benefit plan for newly hired municipal employees pursuant to section 607(e)." Section 607(e) uses language which directs "consultation" rather than "bargaining" when developing the newly revised benefit plan. Section 607(e) also indicates the revised benefit plan "shall be within the scope of collective bargaining pursuant to the applicable law subsequent to the establishment of the revised benefit plan." Clearly the legislature's intent to use its power to alter a bargained

*Local 302, International Association of Fire Fighters,*
*supra,* is inapposite in determining whether the Union had a
clear right to relief in this case. The Union failed to
establish such a right.

Questions of the existence of irreparable harm, whether
greater injury will occur by the refusing of an injunction
than by granting it, and whether there will be a possible
adverse effect upon the public have also been raised. In
view of our decision that the Union has not shown a clear
right to relief, there is no need to address the first two of
these three issues. However, we emphasize the irreparable
harm essential prerequisite for the granting of a prelimi-
nary injunction must be immediate and not in the future as
was opined [8] here and thus not established. Further, the
basis of our conclusion that the Union has not shown a clear

contract, present here, was not present in City of Allentown, a signifi-
cant distinction.

**8.** The only evidence presented by the Union on the issue of irrepara-
ble harm was the following opinion testimony of the Union's Presi-
dent, Mr. Earl Stout:

Q. Let me also ask you this: In terms of your own union, what
would be the effect of you having collectively bargained for what
you did and for the pension plan for your existing members, and
there then were new members who had lesser pension benefits?
A. It would destroy our—
Mr. TETI: Objection. There is really no foundation for that.
THE COURT: We will allow it, go ahead.
BY MR. SPRAGUE:
Q. Go ahead.
A. It would destroy our union, because what would happen is, we
would have disgruntled workers because *eventually over the years*
you would have half the people with one type of pension and the
other people with the other type of pension and the other people
with the other type of pension and before you know it, we would
have people dropping out of the Union because they would accuse
the Union of not negotiating in good faith when we were negotiat-
ing. And we will not permit that to happen. Just like with the sick
leave, and with the vacation, they asked us to include just the people
that was coming in, the new people, and we say no on the same
grounds, because there would be disgruntled employees in the
bargaining unit and we were not going to go for that because we
seen the chance there that the City had that they would divide this
Union and tear it apart, which they are trying to do all the time.
(Emphasis added.)

right to relief affirmatively disposes of the question of a possible adverse effect upon the public. There are no apparently reasonable grounds to sustain the preliminary injunction.

Accordingly, the judgment of the Commonwealth Court should be reversed and the preliminary injunction issued by the court of common pleas should be vacated.

FLAHERTY and McDERMOTT, JJ., join this Opinion In Support of Reversal.