**TINICUM TOWNSHIP**

v.

**DELAWARE VALLEY CONCRETE, INC. and Mario Diliberto, Appellants.**

Commonwealth Court of Pennsylvania.

Argued Nov. 5, 2002.

Decided Dec. 13, 2002.

As Amended Dec. 17, 2002.

As Amended Dec. 30, 2002.

William E. Benner, Doylestown, for appellants.

Robert J. Sugarman, Philadelphia, for appellee.

Thomas M. Crowley, Harrisburg, for amicus curiae, PA Dept. of Environmental Protection.

BEFORE: SMITH–RIBNER, J., PELLEGRINI, J., and FLAHERTY, Senior Judge.

1. The Department of Environmental Protection (DEP) submitted an amicus curiae brief in support of DVC's appeal and was permitted to argue.

2. The agreement between the Township and Diliberto provides in relevant part:
> 3. All quarrying must cease, and all stockpiles on site are to be removed, within ninety (90) days after issuance of necessary building permits or their equivalent, except for that necessary to construct a golf course. There shall be no blasting. If this agreement becomes void, it is without prejudice to the owner to pursue all other remedies.

3. Ordinance 127 provides in relevant part:
> Ordinance 127, "Regulating Blasting Activities"
> Pursuant to the provisions of the Pennsylvania Municipalities Planning Code and the Second Class Township Code, in order to protect the health, safety and welfare of the Township, Tinicum Township, Bucks County ordains as follows:
> Article I, "Purpose"

OPINION BY Judge PELLEGRINI.

Delaware Valley Concrete, Inc. and Mario Diliberto (collectively, DVC) appeal from an order of the Court of Common Pleas of Bucks County (trial court) granting Tinicum Township's (Township) request for a preliminary injunction to enjoin DVC from blasting in their quarrying operation.[1]

Mario Diliberto owns property in Tinicum Township that he leases to Delaware Valley Concrete for the purpose of operating a limestone quarry. In December 1996, DVC applied to the DEP for a permit to deepen the quarry. In 1997, Diliberto and the Township entered into an agreement regarding the development of a golf course on the quarry land which included a provision prohibiting blasting at the quarry (1997 contract).[2] As of the date of trial, no golf course had been constructed at the quarry site.

In 1999, the Township adopted what is known as Ordinance 127 (Blasting Ordinance)[3] pursuant to both the Pennsylvania

> It is against public policy to permit uncontrolled, unrestricted blasting. The purpose of this Ordinance is to prevent needless damage to life and property because of improper blasting and the nuisances caused by blasting.
> Article III, "General Limitations"
> A. It shall be unlawful to conduct blasting without complying with this Ordinance.
> B. It shall be unlawful to conduct blasting within 2,000 feet of a structure listed on the National Register of Historic Places, a National Heritage Corridor, a structure contributing to the National Register Historic District, or a public park unless it pertains to a residential use and is reviewed and approved by Tinicum Township.
> C. It shall be unlawful to conduct blasting that shall cause a peak particle velocity greater than one inch per second, measured at the immediate location of any non-owned dwelling unit, public building, public park, school, church, hospital, commercial building, industrial building, livestock shelter, barn, or other inhabited structures.
> D. It shall be unlawful to conduct blasting within 300 feet of a public road or bridge and

Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202(MPC), and The Second Class Township Code, Act of May 1, 1933, P.L. 103, *as amended,* 53 P.S. §§ 65101–68701. The Blasting Ordinance makes it illegal for a property owner to engage in blasting without first obtaining a blasting permit. The Blasting Ordinance regulates the detonation of all explosives, except for fireworks, and is applied to anyone engaged in blasting except for a police bomb squad. It also establishes a 2,000–foot setback from all national historic landmarks and a 300–foot setback from any type of inhabited building.

In 2001, following almost five years of review, the DEP issued a mining permit under the Non–Coal Surface Mining Conservation and Reclamation Act (Non–Coal Act), Act of December 19, 1984, P.L. 1093, *as amended,* 52 P.S. §§ 3301–3326, to DVC, authorizing the deepening of the quarry through blasting.[4] In order to measure the relationship between the ground vibration frequency at structures around the quarry and the natural resident frequencies surrounding those structures, the mining permit required DVC to conduct a "Test Blast Protocol."[5]

The Township appealed the grant of the permit and also filed a request for supersedeas with the Environmental Hearing Board (EHB) alleging that the blasting would threaten the water supplies, endanger the public's health, cause excess pollution and expose the community to the risk of rock slides. On December 7, 2001, the EHB denied the Township's supersedeas request but did not rule on the merits of the appeal.

On March 20, 2002, upon learning DVC was performing pre-test blasting surveys in preparation for the "Test Blast Protocol," the Township sent a "Stop, Cease and Desist Order" to DVC informing them that the proposed blasting was a violation of the Blasting Ordinance. At the same time, the Township also filed a complaint in equity with the trial court seeking preliminary and permanent injunction, claiming the proposed blasting violated its Blasting Ordinance, constituted a private and public nuisance because the blasting create a danger to the health, safety and welfare of the community, and breached the 1997 contract between DVC and the Township. The Township claimed that the proposed blasting would violate the Blasting Ordinance because the blasting would occur within 2,000 feet of a national historic landmark, namely, the Delaware Canal, which was less than 1,000 feet from the quarry. On March 20, 2002, the trial court entered an *ex parte* special temporary injunction enjoining DVC from conducting any blasting at the quarry, pending a hearing on the requested preliminary injunction.

the structures listed in c above unless it pertains to a residential use and is reviewed and approved by Tinicum Township.

4. The Non–Coal Act was passed to address the negative affects of surface mining by improving conservation of the land, protecting the health and safety of citizens and wildlife, and limiting pollution. Its provisions are enforced by the DEP, and it preempts all local regulations that regulate surface mining.

5. A "Test Blast Protocol" is the process by which DEP and the quarry performing the blasting measure and assess the impact blasting has on the surrounding structures and properties. In implementing the "Test Blast Protocol," the quarry detonates blasts, gradually amplifying the strength of each blast, until it reaches the amount needed to successfully quarry, while also taking readings from seismographs located at varying distances from the blast location to determine the magnitude of the vibration from each individual blast.

At the preliminary injunction hearing,[6] the Township presented the testimony from David Levinson (Levinson), a resident in a house located approximately 2,000 feet from the quarry and over 3,000 feet from the test blast area. He testified that a boulder weighing approximately four to five tons which was situated on a cliff rising a few hundred feet directly behind and above his house was positioned precariously enough that it could fall at any time. Levinson stated his attention was drawn to this boulder by Frank Chiappetta (Chiappetta), DVC's blasting consultant, who advised Levinson that the chances of any vibration reaching the area of the boulder and dislodging it were very small; nonetheless, Chiappetta still recommended Levinson evacuate his home on the days that blasting was going to occur.

The Township also called Gary Pearson (Pearson), a Township supervisor and a property owner living less than one thousand feet from the quarry. Pearson estimated approximately six homes, including his, abutted the shale cliff near the quarry, and that he had seen rocks and trees break free from the cliff and fall upon the properties below. Pearson also testified regarding the implementation of the Blasting Ordinance and as to his understanding of the 1997 contract.

The Township's expert witness, Robert Alperstein (Alperstein), a geotechnical engineer, testified that he had toured the site in question, examined the shale cliffs located behind the residential properties near the quarry, and calculated the potential ground vibrations if blasting were to occur at the quarry. Alperstein testified that the cliffs located behind the properties near the quarry were very unstable and friable, and that blasting would increase the probability of rocks falling from the cliffs, including the boulder above the Levinson house. On cross-examination, Alperstein admitted he could not predict with any certainty the probability that rocks would fall from the cliffs.

In rebuttal, DVC's expert witness, Chiappetta, testified that he expected no significant seismic activity to affect the position of the boulder above the Levinson house, but admitted that if vibrations from blasting were to reach the boulder's location, it could dislodge it and cause it to fall. He admitted he did not do any calculations as to the affects of the vibrations on the shale cliffs behind the other residencies, but opined no seismic activity would register there either. Chiappetta also testified as to the danger of fly rock, the material ejected into the air due to the detonation of explosives, but that precautions would be taken to minimize the risk of nearby people being hit by projectiles.[7]

---

**6.** During those proceedings, the court permitted Levinson to intervene into the case because he had been informed by Chiappetta, a blasting engineer hired by DVC, that during blasting, there was a danger of falling rocks. However, because DVC agreed to suspend any blasting activities for 45 days in order to allow Levinson to remove a large rock situated on the cliff above his property, Levinson withdrew as an intervenor.

**7.** Also testifying during the hearings were Corporal Richard E. Peterson with the Township's Police Department, who testified that the police department only had five officers and that policing the site would be difficult;

Ken Lewis, the park manager for Delaware Canal State Park, who testified that the state park was always accessible by the public and that there had been recent renovations to the lock walls of the canal; James Sabath, Chief of the Township's Police Department, who testified that DVC has had problems with trespassers in the past and that he was concerned with the safety of trespassers who were present during blasting; Nicholas C. Forte, Chairman of the Board of Supervisors of the Township, who testified regarding the negotiations for the 1997 contract between the Township and Diliberto and as to his

■ Based on the testimony that the proposed test blast presumptively violated the Blasting Ordinance and generally exposed the community to a common law nuisance due to the increased risk of harm to people and property from falling rocks dislodged by blasting, the trial court enjoined DVC from blasting. The trial court found that loose rocks and boulders near the blasting site and residential properties might cause property and structural damage, as well as endanger the lives of nearby occupants. The trial court also found that while blasting was the most efficient and economical method to surface mine at the DVC quarry, alternative non-blasting methods could be used to mine materials from the quarry. DVC filed this appeal [8] contending that the trial court erred in granting the preliminary injunction because: (1) the provisions of the Blasting Ordinance establishing a setback are preempted by the Non–Coal Act; and (2) the trial court erred in enjoining DVC from blasting as a nuisance.[9]

---

understanding of the phrase, "There shall be no blasting."

8. Our scope of review in an appeal of a preliminary injunction is to determine whether there were any reasonable grounds for the trial court's grant of a preliminary injunction, and we will reverse only if no such grounds exist. *City of Philadelphia v. District Council 33*, 528 Pa. 355, 598 A.2d 256 (1991). In order for a preliminary injunction to be granted, the court must apply the following standards: (1) the injunction must be necessary to prevent immediate and irreparable harm that could not be compensated by damages; (2) greater injury would result by refusing the injunction than by granting it; (3) the injunction restores the parties to the status quo that existed immediately before the alleged wrong; (4) the wrong is manifest and the injunction is reasonably suited to abate it; and (5) the applicant's right to relief is clear. *In Re Milton Hershey School Trust*, 807 A.2d 324 (Pa. Cmwlth.2002), citing *City of Philadelphia v. District Council 33*, 528 Pa. 355, 598 A.2d 256 (1991).

DVC argues that the trial court did not follow the standards for granting a preliminary injunction because the injunction did not preserve the status quo. They contend that they were granted a permit by DEP to deepen their quarry through the use of blasting, and the permit represented the status quo. DVC concludes that on April 29, 2002, when the trial court enjoined DVC from blasting, the status quo was altered because they possessed a DEP permit they could no longer use. The basic purpose of a preliminary injunction is to preserve the status quo as it exists or previously existed before the acts complained of, thereby preventing irreparable injury or gross injustice. *Maritrans GP Incorporated v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277 (1992). The status quo to be preserved by a preliminary injunction is the last peaceable and lawful non-contested status preceding the underlying controversy between the parties or the alleged wrongful conduct of the party whose actions are sought to be enjoined. *Sameric Corporation of Market Street v. Goss*, 448 Pa. 497, 295 A.2d 277 (1972). · Because the status quo is the last non-contested, peaceable status, in this case, we consider that time to be immediately prior to DEP's issuance of the mining permit to DVC. Furthermore, this finding prevents any potential irreparable harm that would result from blasting by DVC.

9. DVC also contends that the trial court erred in enjoining the blasting based on a breach of the 1997 contract between the Township and Diliberto. The Township contends that the language in the 1997 contract is unambiguous and prohibits all blasting in the quarry area, while DVC argues that the 1997 contract was only intended to prohibit blasting in connection with the development of a golf course, not a complete ban on blasting, and regardless of the contract's interpretation, no breach has yet occurred, making the grant of an injunction inappropriate at this time. We need not address these arguments because the trial court specifically stated that the order was based on the breach of the Blasting Ordinance and the risk of harm to nearby lives and property, and failed to mention any purported breach of the 1997 contract as a basis for the grant of the preliminary injunction.

## I.

DVC argues that the Township's Blasting Ordinance is pre-empted by Section 16 of the Non–Coal Act.[10] Section 16 states:

Except with respect to ordinances adopted pursuant to the Act of July 31, 1968 (P.L. 805, No. 247), known as the 'Pennsylvania Municipalities Planning Code' all local ordinances and enactments purporting to regulate surface mining are hereby superseded. The Commonwealth, by this enactment, hereby pre-empts the regulation of surface mining as herein defined.

52 P.S. § 3316. Section 3 of the Non–Coal Act defines "surface mining" as:

[T]he extraction of minerals from the earth, from waste or stockpiles or from pits or from banks by removing the strata or material that overlies or is above or between them or otherwise exposing and retrieving them from the surface . . .

52 P.S. § 3303. DVC contends that the Blasting Ordinance, including its setback requirements, is not a land use ordinance[11] but instead, involves the regulation of surface mining; therefore, it is preempted.

We have previously addressed whether ordinances imposing restrictions on mining purporting to be enacted pursuant to the Municipalities Planning Code (MPC) were preempted by the Non–Coal Act. In *Warner Company v. Zoning Hearing Board of Tredyffrin Township*, 148 Pa.Cmwlth. 609, 612 A.2d 578 (1992), *petition for allowance of appeal denied*, 533 Pa. 654, 624 A.2d 112 (1993), we addressed whether a township which amended its zoning ordinance by adding new clauses defining and regulating quarrying operations impermissibly regulated mining. The amendment imposed setback requirements prohibiting mining and excavation within 300 feet of any national historic place or residence; established quarrying operations as a use permitted by special exception; required specific buffer and berm requirements; regulated the storage of overburden; established procedures for reclamation upon cessation of quarrying operations; and required dikes, barriers or structures to control the drainage from the operation. In finding that the Non–Coal Act preempted the provisions dealing with buffers and berms, overburden storage, reclamation and drainage structures, we stated:

Surface mining, as defined in section 3 of the Non–Coal Act, 52 P.S. § 3303, includes all surface activity connected with the mining. Those surface activities

---

**10.** During oral argument before this Court, the Township admitted that many of the other provisions of the Blasting Ordinance (dealing with peak particle velocity, etc.) were preempted by the Non–Coal Act. However, the Township still contends that the setback provisions of the Blasting Ordinance are not preempted.

**11.** Just because an ordinance purports to be enacted pursuant to the Municipalities Planning Code does not mean that it is enacted pursuant to the Municipalities Planning Code. First, the subject matter must fall within either Section 503 of the MPC, 53 P.S. § 10503, which deals with the proper subject of subdivision and land development ordinance, or Section 603 of the MPC, 53 P.S. § 10603,

dealing with uses of land, size, height, bulk, location, areas of dimensions of land to be occupied by structures, as well as areas and other open areas and distances to be left unoccupied by uses and structures and density of population and intensity of use; i.e. zoning ordinances. *See Land Acquisition Services, Incorporated v. Clarion County Board of Commissioners*, 146 Pa.Cmwlth. 293, 605 A.2d 465 (1992). Not only must the subject matter be proper, the ordinance must be enacted in accordance with the procedures set forth in Section 505 of the MPC, 53 P.S. § 10505, for subdivisions ordinances, or Section 609 of the MPC, 53 P.S. § 10609, for zoning ordinances.

integral to surface mining necessarily include the removal of overburden, the construction of buffers and berms and the reclamation of the affected land. [Those sections] of the township's ordinance attempt to regulate surface activities ... which the Non–Coal Act and Warner's permit also specifically address. Hence, in accordance with section 16 of the Act, the amendments that attempt to regulate Warner's surface mining operations are preempted by the Act.

612 A.2d at 582. However, we went on to hold that the setback requirements prohibiting quarrying uses, regardless of whether blasting was involved and only permitting quarrying by special exception, were not preempted because they were traditional land use regulations.

We again addressed this issue in *Pennsylvania Coal Company, Incorporated v. Township of Conemaugh*, 149 Pa.Cmwlth. 22, 612 A.2d 1090 (1992), *petition for allowance of appeal denied*, 533 Pa. 626, 620 A.2d 492 (1993). In that case, the Township of Conemaugh amended its zoning ordinance by adding new provisions that extensively regulated the operation of surface coal and non-coal mining activities. The amendments required surface mining applicants to apply for a permit from the Township of Conemaugh, addressed the extraction of coal, dealt with excavations and fills, and dealt with blasting. Because the local ordinance extensively regulated the operation of surface coal mining activities and went beyond the purviews of traditional land use controls, we held that it was preempted by the Non–Coal Act.

■ In this case, the regulations the Township's Blasting Ordinance establishes are like the type of regulation that we struck down in *Conemaugh*, as being preempted, because it regulated surface mining operations rather than the traditional land use regulations held to be valid in *Warner*. Unlike the zoning amendments involved both in *Warner* and *Conemaugh*, the Blasting Ordinance is a stand-alone ordinance that is not part of a zoning code or subdivision regulation, and all of its provisions go to when, where and how blasting can occur rather than what, where and how a particular land use will be permitted. Also, unlike the setback requirement at issue in *Warner*, which established a setback prohibiting mining within 300–feet of a national historic place or a residence, regardless of whether blasting occurred, the Township's Blasting Ordinance prohibits only blasting, not mining altogether, within its setback, which goes to the manner in which limestone is going to be extracted. Because blasting is an integral operation in surface mining and the extraction of minerals, it is, therefore, considered a surface activity connected with surface mining as defined in Section 3 of the Non–Coal Act, 53 P.S. § 3303. Because blasting is a surface mining activity regulated by the DEP and addressed by the Non–Coal Act and DVC's permit, the Township's Blasting Ordinance is preempted by Section 16 of the Non–Coal Act.

## II.

The other basis that the trial court grounded the grant of the preliminary injunction in was that the blasting constituted a common law nuisance. DVC contends and DEP agrees that the trial court did not have reasonable grounds to enjoin the blasting as a nuisance because mining cannot be a nuisance *per se* since it is conducted pursuant to a DEP issued permit, issued after years of review. They argue that to hold otherwise will mean that the comprehensive review process for issuing permits, as well as the appeal process provided to the EHB, will be impaired, and applicants will no longer be able to

rely on permits that have been issued if trial courts can issue injunctions based on nuisance when an applicant has met regulatory requirements.

Recently, this issue was addressed by our Supreme Court in *Machipongo Land and Coal Company, Incorporated v. Department of Environmental Protection,* 799 A.2d 751 (Pa.2002), which involved whether a DEP regulation that determined land unsuitable for mining constituted a regulatory take. Notwithstanding the permitting process that would have to be satisfied before any mining could occur and notwithstanding compliance with those requirements, DEP argued that a nuisance, nonetheless, would be caused if mining would be permitted which would prevent any need for compensation. We precluded DEP from introducing any evidence that the operation of the mine would constitute a nuisance, because if the proposed surface and underground mines met all statutory and regulatory provisions, then the use could not be considered a nuisance because it was in accord with the comprehensive regulatory scheme that the General Assembly crafted and the DEP implemented to protect the public. However, our Supreme Court reversed, holding that if mining causes or has a significant potential to cause a public nuisance, it can be prohibited regardless of whether the landowner complied with all applicable statutes and regulations. *Machipongo,* 799 A.2d at 755.

▮ In this case, the trial court issued a preliminary injunction because, among other reasons, blasting would cause a nuisance. The Township's expert witness, Alperstein, testified that the cliffs above the nearby residential properties were very loose and friable, and that blasting would cause a high probability of rocks dislodging from the cliffs and endangering the lives and property of those below. DVC's expert witness, Chiappetta, stated that the chances of a vibration reaching the boulder above Levinson's house were minimal to non-existent, but he admitted that the boulder was so precariously positioned that a vibration could dislodge it, and he recommended Levinson and his family evacuate their home on days blasting was to occur. Moreover, Chiappetta stated that he never calculated the stress vibrations might place on the cliffs located behind other residences in between the Levinson house and the quarry. Because there are reasonable grounds in the record to support the trial court's grant of a preliminary injunction based on nuisance, we affirm. *Ucheomumu v. County of Allegheny,* 729 A.2d 132 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 740 A.2d 1151, 559 Pa. 724 (1999).

Even though we find the Blasting Ordinance was preempted by the Non–Coal Act, the trial court had a reasonable basis under a common law nuisance doctrine to grant the preliminary injunction, and, accordingly, the order is affirmed.

### ORDER

AND NOW, this *13th* day of *December,* 2002, the order of the Court of Common Pleas of Bucks County, No. 02–01876–26–5, dated April 29, 2002, granting a preliminary injunction, is affirmed.